Babajide IFELOWO, Appellant,

v.

UNITED STATES, Appellee.

No. 98–CF–211.

District of Columbia Court of Appeals.

Argued June 13, 2000.
Decided Aug. 2, 2001.

David Benowitz, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Jonathan M. Malis, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, Roy W. McLeese, III, and John Moustakas, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB, REID and GLICKMAN, Associate Judges.

REID, Associate Judge:

In this case, appellant Babajide Ifelowo, who was convicted of several criminal offenses,[1] contends that the trial court (1)

---

1. Ifelowo was convicted of two counts of robbery (of Alan Haley and Donna Sibley), in violation of D.C.Code § 22–2901 (1996); armed robbery of a senior citizen (Benjamin King), in violation of §§ 22–2901, –3202 and –3901(a); and assault with intent to commit robbery while armed (Georgia King and Benjamin King), in violation of §§ 22–501, –3202.

abused its discretion by failing to sever counts of the indictment relating to three separate events; (2) erred by: (a) limiting his cross-examination of a rebuttal witness with respect to credibility, while permitting the government to bolster the witness's credibility during closing argument; and (b) failing to give the complete standard instruction regarding witness immunity. We affirm the trial court's judgment of convictions. We hold that the combination of consistent features of each of the three robberies outweighed the variations, and that any striking differences were cured by the rebuttal testimony of the other robber, Shotikare, who implicated Ifelowo in all three incidents. We summarily dispose of Ifelowo's other arguments.

## FACTUAL SUMMARY

The government presented evidence against Ifelowo, in its case in chief, through several witnesses. Their testimony shows the following events, information, and allegations. Ifelowo and Shotikare, former roommates who both lived previously in the same West African country, were indicted for the same criminal offenses which took place on three separate days in February 1997, in the District. Each of the crimes involved the use of the same vehicle. On February 3, around 10 p.m. at Vermont and K Streets, N.W., Allan Haley, a former language instructor, withdrew $70.00 from the ATM machine at the First Union bank. As he was trying to obtain more money from the machine, a man with a foreign accent, which Mr. Haley described as "similar to a couple of guys [he] had worked with from the Ivory Coast or Cameroon, West Africa[,]" demanded the money he held in his hand.

The man, later identified as Shotikare, was in his late 20s or early 30s, medium to dark-complected, 6'1″ tall, and weighed about 180 pounds. Shotikare "had his right[ ] hand in his jacket pocket and, [ ] it was raised toward [Mr. Haley] as if it were a firearm." The man made a second demand for money, saying: "[G]ive me the money in your hand or I will blow your f-k-g head off." After Mr. Haley gave him the money, Shotikare "turned, and walked back to the car[,]" "a gray or silver 80's model hatchback," which was located about twenty feet away. The license tag of the car was covered with yellow-brown cardboard. When asked to "describe the manner in which Shotikare walked back to the car[,]" Mr. Haley said: "He seemed pretty cool about it."

Mr. Haley said little about the driver of the car. He was asked: "Could you tell during the incident whether the driver was paying attention to what was going on?" He responded: "[W]hen I looked at the driver he was looking straight ahead, ... which would not be at me, but he was looking straight ahead down the street." When the prosecutor inquired whether Mr. Haley was "able to describe what the driver ... looked like[,]" he replied: "Just that he was a black man with what appeared to be a moustache.... And he had fairly prominent cheek bones."

Several days after the incident, a police detective showed Mr. Haley "a group of photos and asked [him] to look through them." Mr. Haley set aside two photographs, and eventually selected one, which was a picture of Shotikare, as the man who robbed him. He was unable to identify the driver of the getaway car because he "didn't see his face ..., [and] only saw him at a distant profile."

Although Eniola A. Shotikare, was indicted as a co-defendant on the same counts, the gov-

.ernment agreed to sever defendants.

Ms. Sibley was walking to her home in the Georgetown area of the District from Georgetown University on the evening of February 6, 1997, around 9 p.m., when she crossed Wisconsin Avenue, N.W., moving toward P Street, N.W. Suddenly, she encountered two men who "stepped out from ... behind a tree ... box." The man "on [her] left had his hand in a pocket of [his] coat and he said this is a gun, give us your bag." Ms. Sibley commented more than once about how "quiet" the event was: "[I]t was very, very very quiet, and it was hard for me to hear." She did not detect a foreign accent in either man's speech.[2] The man on Ms. Sibley's "right said this is a gun [a]nd he also had his hand in his pocket and said this is a gun, give us your bag." Ms. Sibley held out her purse, and one of the robbers took it after asking whether it contained money, and she replied that it did. She was directed to walk toward Wisconsin Avenue. She complied, but turned around and saw the men get into an automobile. She stated: "[I]t was strange because it was a small car and they seemed extremely tall to me."[3] At that moment, a passerby who lived in the neighborhood, Dale Overmyer, was walking down the street.

Mr. Overmyer noticed a few people in front of his house in the 3100 block of P Street, N.W., whom he did not recognize. He then saw Ms. Sibley who "stopped [him] and said she [had] just been robbed by these two men." When Mr. Overmyer looked, he saw "two black men getting into a car." He started to run toward them but stopped when Ms. Sibley warned him that "they have got guns." He asked whether Ms. Sibley was "okay." When

she said, "yes," he looked at the car again. He saw "two black men." However, "[t]here wasn't anything distinguishing about them.... [T]hey weren't real short or wearing anything strange or anything that particular that [he] would remember."[4] He never saw the faces of the men. The car in which the men drove away was "a light gray or light silver, very small car like a two door hatchback. Sort of an older model." The men "weren't fleeing in a hurry. The car didn't screech out or speed away in a real hurry. It just drove away normally." Mr. Overmyer did not notice the license plate of the car.

When a police officer questioned Ms. Sibley about the robbery, she described the robbers as "tall and thin," and black. Approximately six days after the robbery, a police detective contacted Ms. Sibley and asked her to look at some photographs of men, and one or two photographs of a car. She picked out two photographs of men, but could not identify the car. The police officer who showed the photo array to Ms. Sibley testified that she selected the pictures of Shotikare and Ifelowo as those of the men who robbed her. She stated that Ifelowo was the man on her left during the robbery, and that Shotikare was the person closest to her, to whom she gave her purse. In court, Ms. Sibley also identified the picture of Ifelowo as the man who was on her left during the robbery.

Around 9 p.m. on February 11, 1997, Georgia and Benjamin King, husband and wife, were walking home after having seen a movie. They crossed 31st and N Streets, N.W. In the middle of the block

---

2. Although Ms. Sibley said she was able to distinguish accents, including Caribbean and West African, because of her international work, she does not "necessarily notice[ ] ... whether people have accents or not because in [her] business [is] an international consult-

ing firm and [she] talk[s] with people from various countries on a daily basis."

3. Ms. Sibley is 5'1" tall.

4. Mr. Overmyer is 6'2" tall.

was a dumpster, in front of a house that was being renovated. Mrs. King saw that a "car had ... stopped and two young men jumped out of the car. One came around the dumpster" and "stopped" the Kings. "He had a big knife in his hand and said in an accent what sounded like, 'This is a stuck up.[5] Give me your ... money.' " Mrs. King recalled that he had a "very pronounced accent," and wore light pants and a "darker top." She described the knife as "a butcher knife." The man "was holding [the knife] at [her] husband's stomach...." The other young man, who "had not come to the sidewalk, [ ] asked for [her] hand bag." She saw no weapon in his hand. Mrs. King told the man that she didn't have a hand bag. She had no money at all on her person. Mr. King removed his wallet and gave money to the man with the knife. The men then got into the car which they had left "double-parked on the street with the engine running and the passenger door open." Mrs. King described the car "[a]s being a small hatch back, light color, whitish; white color. White in color. With the tag being covered by something beige or yellow...." Later that same evening, Mrs. King was taken to a location where she identified the car. She was unable to identify the two men. She commented that one "looks about right but I couldn't tell about the face." She explained that "the height and the build" and the clothing "look[ed] about right" with respect to the man with the knife.

Mr. King's account of the robbery was similar to that of his wife. However, he said that during the robbery, the second man was "[s]tanding by the car." Immediately after the robbery, the man with the knife "ran into the street and got into the [passenger side of the] car." He remembered only that the car "was small, light-colored and looked a bit beat up." He asserted that the accent of the man with the knife "sounded somewhat West African to [him]." He was unable to identify either robber at the show-up identification location.

Officer Michael Barron of the Metropolitan Police Department ("MPD") was on duty around 9 p.m. on February 11, 1997, in his privately owned vehicle. He was on "a robbery detail in plain clothes," and was situated in the 1200 block of Wisconsin Avenue, N.W. He began to follow what appeared to him to be a suspicious pedestrian. However, he saw "a silver or gray colored car," which was a small hatchback with two doors and a piece of cardboard where the license tag is usually placed, carrying two black males who looked tall and thin. He began to follow the car instead of the suspicious man on the street, because he thought its occupants fit the description of a robbery that had occurred earlier in the week. The car in which the men were riding came to an abrupt stop near 31st and N Streets, N.W. Officer Barron pulled his vehicle to the side. He watched the two men get out of the car and walk to the sidewalk. The dumpster obstructed Officer Barron's sight, and he decided to drive over to the car from which the men had exited. He stopped behind the car and left his headlights on. He observed Ifelowo and Shotikare "walking away from an elderly couple...." Ifelowo "was carrying a light blue knit cap in his hand," which had "a glint of metal," and Shotikare carried "a black knit cap." The men walked to the car and Shotikare got into the driver's seat, and Ifelowo into the front passenger seat. He saw Shotikare's face, and noted that Ifelowo "had on a black T-shirt and gray sweat pants." Officer Barron chased the car,

5. Mrs. King emphasized what she heard as "stuck up" instead of "stick up."

with the assistance of other MPD officers. The car was stopped and Ifelowo and Shotikare were removed. Later, a knife was recovered from 28th and N Streets, N.W.

Ifelowo testified in his own defense. He denied committing the robberies. In addition, he denied being in a car with Shotikare on February 3rd and 6th. However, he acknowledged that he was in a car with Shotikare on February 11th. He stated that he had been shopping in Georgetown and as he was about to catch a bus home, he saw Shotikare who offered him a ride home. Ifelowo accepted the ride, and shortly after he got into the car, the police stopped it. Four other defense witnesses presented character testimony in Ifelowo's behalf.

The government's main rebuttal witness was Shotikare, who testified against his will, pursuant to a grant of immunity.[6] He stated that Ifelowo was with him during each robbery. Ifelowo drove the car for the first robbery and remained in the car while Shotikare demanded money from Mr. Haley. Both men, however, demanded Ms. Sibley's hand bag. Shotikare said he drove the car for the King robbery, and that Ifelowo used a knife from his (Shotikare's) kitchen to threaten the Kings.

## ANALYSIS

### The Severance Issue

We turn first to Ifelowo's argument that the trial court abused its discretion by not severing the counts of the indictment, and

6. A counsel for the government stated that Shotikare "ha[d] been made no offers whatsoever. And any offers that he's made are too complicated to explain to the jury."

7. During oral argument on appeal, counsel for Ifelowo stated that his severance argument is limited to prejudicial joinder under Super. Ct.Crim. R. 14, which provides, in pertinent part:

trying him separately on each count.[7] In *Bright v. United States*, 698 A.2d 450 (D.C. 1997), we summarized the basic legal principles governing our review of the denial of a motion to sever counts:

" 'A motion for severance on the ground of prejudicial joinder is committed to the sound discretion of the trial court.' " *Arnold v. United States*, 511 A.2d 399, 404 (D.C.1986). We " 'will reverse the denial of a motion to sever counts under Super. Ct.Crim. R. 14 only upon a clear showing of abuse of discretion.' " *Parks v. United States*, 656 A.2d 1137, 1139 (D.C.1995) (referencing *Winestock v. United States*, 429 A.2d 519, 526 (D.C. 1981)). To meet his or her burden under Rule 14, a defendant " 'must show "the most compelling prejudice" ... from which "the court would be unable to afford protection" if both offenses were tried together.... It is not sufficient to show that the defendant would have a better chance of acquittal if the charges were tried separately.' " *Arnold, supra,* 511 A.2d at 404 (quoting *Winestock, supra,* 429 A.2d at 527). Furthermore, " '[w]hen joinder is based on the "similar character" of the offenses, "a motion to sever should be granted unless (1) the evidence as to each offense is separate and distinct, and thus unlikely to be amalgamated in the jury's mind into a single inculpatory mass, or (2) the evidence of each of the joined crimes would be admissible at the separate trial of the others." ' " *Id.* (citation omitted; footnote omitted).

If it appears that the defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the Court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires....

*Id.* at 454. In this case, the government proceeded on the theory that the three robberies were of "similar character," and that, "the evidence of each of the joined crimes would be admissible at the separate trials of the others." *Id.* To determine whether the robberies with which Ifelowo was charged are sufficiently similar in character to permit their trial together, we apply the following fundamental principles:

> The applicable standard is whether the crimes are "so nearly identical in method that it is likely that the present offense has been committed by the defendant." *Wright* [*v. United States*], 570 A.2d [731,] 734 [ (D.C.1990) ] (citations omitted). But the crimes need not share a single unique characteristic or "distinctive similarity," *id.;* "the court can consider the totality of the factual circumstances which[,] amalgamated, lay a sufficient basis for admission under the *Drew* [*v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964)] doctrine." *Id.* (quoting *Gates v. United States*, 481 A.2d 120, 123 (D.C.1984), *cert. denied*, 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985)). Ultimately there must be "enough points of similarity in the combination of circumstances surrounding the two crimes to create a reasonable probability that the same person committed each." *Id.* (quoting *Easton v. United States*, 533 A.2d 904, 908 (D.C.1987)).

*Bond v. United States*, 614 A.2d 892, 896–97 (D.C.1992). Moreover, we recognize that where counts are joined for trial, " 'there is a substantial risk of prejudice.' " *Coleman v. United States*, 619 A.2d 40, 43 (D.C.1993) (quoting *Evans v. United States*, 392 A.2d 1015, 1020 (D.C.1978)). At least two possible dangers are posed where separate offenses, committed on different dates, are tried together. "The obvious danger ... is that the jury might conclude that one accused of multiple crimes must be guilty of something and 'cumulate the evidence against him.' " *Id.* (quotation omitted). "There is also the danger that the jury might return a conviction based on proof of the other offenses, even though the evidence might otherwise be insufficient on a joined offense." *Id.* (citation omitted).

Ifelowo specifically contends that, "[t]he evidence presented with respect to each incident was not mutually admissible." He maintains, in essence, that the government's evidence, that (1) the same car, a silver or gray older model hatchback car, was used in all three robberies, and that (2) one of the assailant's had a West African or West Indian accent, was insufficient to identify Ifelowo as the second person who participated in the robberies with Shotikare, or that if he accompanied Shotikare during the third robbery, he was the accomplice in the first two.[8] In response to Ifelowo's contentions, the government argues that: "The similarities in the robberies, corroborated by [ ] Shotikare's testimony, made it reasonably probable that [Ifelowo] committed each offense, and thus evidence of each robbery would have been mutually admissible in separate trials of the other robberies to prove Ifelowo's identity as [ ] Shotikare's accomplice."

The government maintains that the three robberies had at least the following points of similarity. They took place between 9 and 10 p.m. in the evening, in the month of February, within a nine-day period, and within relatively close geographical proximity (Vermont and K Streets, N.W.; Wisconsin and P Streets, N.W.; and 31st and N Streets, N.W.). Witnesses to the three robberies gave a similar description

---

**8.** Ifelowo's defense with regard to the first two robberies was misidentification, and innocent presence with respect to the third robbery.

of the car in which the robbers left the crime scene; and the perpetrators generally were described as thin black men who spoke with a West African or West Indian accent, or as one witness put it, in a manner that was difficult to understand. The government adds as points of similarity the "target[ing] of a single individual or a highly vulnerable couple ... alone on the street"; the approach of the victims and the demand for money; the "use[ ] of weapons or the threat of weapons to frighten the[ ] victims"; and the "walk[ ] back to the[ ] get-away car and [the] dr[i]ve off at a normal pace."

Ifelowo, however, points to dissimilarities in the three robberies, which he contends, are at odds with the principle that: "Ultimately there must be enough points of similarity in the combination of circumstances surrounding the two crimes to create a reasonable probability that the same person committed each." *Bond, supra,* 614 A.2d at 897 (quoting *Easton, supra,* 533 A.2d at 908) (internal quotations omitted). Ifelowo's points of dissimilarity are based, in part, on the trial court's rulings when it recognized that the two men would be tried separately, but denied the motions to sever counts.[9] In denying the motion to sever, the trial judge stated:

I will say that I do see salient points of similarity in these incidents having to do with the proximity in time and place, having to do with the automobile description with the tags, of the men involved, the fact that these are street robberies, the similar modus operandi of pulling up, jumping out, robbing somebody on the street and hopping back in the car and leaving, kind of quick fear and violence sort of things. There's a description of the two men involved, and I think telling is the accent. The descriptions as well of the men involved I think is significant and precise.[10]

Contrary to the trial court's conclusion, Ifelowo insists that the three robbery incidents do not reflect " 'an unusual modus operandi such that there is a reasonable probability that one person committed all the offenses.' " *Cantizano v. United States,* 614 A.2d 870, 874 (D.C.1992) (citation omitted).[11] Furthermore, Ifelowo asserts that: "there is [no] 'concurrence of unusual and distinctive facts' that point to [his] identity" as the second robber. He focuses on the second robbery and the accents of the assailants, indicating that in stating her lack of understanding of the robbers, Ms. Sibley referred to how softly they spoke, not to their accents; and spe-

9. Shotikare was tried first, but the same judge presided over both trials. Prior to Ifelowo's trial, the motion to sever counts was renewed, and denied. The trial judge did not detail his reasons for denying the motion, saying in pertinent part: "[I]t seems to me that there are several areas in which the proof of one or the other of the three offenses would be admissible in respect to the third for purposes of the government establishing its case. So on that ground I feel obliged to deny your motion." The judge reminded defense counsel that he had "heard the evidence in the case ..." because of his involvement in the Shotikare trial.

10. During consideration of Shotikare's motion to sever, the prosecutor indicated that

Mr. Haley said that "the driver was a thin, tall, dark, black male with a moustache seen only in profile." However, during his testimony at Ifelowo's trial, Mr. Haley did not provide this description of the driver. Moreover, as Ifelowo's trial progressed, it became clear that not every witness to the three incidents described the license tags of the getaway car; nor was the description of the two men involved, and the presence of an accent, uniform with respect to all three incidents.

11. We determined that the motion was "properly denied" in *Cantizano, supra,* because "[t]he crimes ... [were] classic signature crimes with an unusual modus operandi...." *Id.* at 874.

cifically said that she did not detect an accent in either man's voice. Ifelowo also emphasizes the lack of a common physical description of his person, especially with respect to the first robbery where the driver was characterized as a "black man with what appeared to be a moustache" and "fairly prominent cheek bones." In addition, he stresses that two of the robberies took place in a residential section of the District, and one in a business area. Moreover, witnesses to the second robbery did not mention cardboard covering the license plate of the getaway car.

We turn to the case law for guidance on the concept of "points of similarity." In *Bond, supra,* the appellant was charged with "five armed robberies committed in four days each by a pair of men one noticeably taller than the other." *Bond, supra,* 614 A.2d at 897. Another common thread of the robberies was "a distinctively recognizable silver handgun." *Id.* However, one of the robberies was executed in a different manner from the others. Instead of forced entry into a car and robbery of the driver, one incident concerned the robbery of a pedestrian while the perpetrators drove a stolen automobile. *Id.* Yet another difference in two of the robberies was "the distinctive use of ATM cards to attempt to gain access to the victim's bank account." *Id.* Despite the differences in the five robberies in *Bond,* we held that there was no prejudicial joinder under Super. Ct.Crim. R. 14 because, "[a]ll told, the similarities were sufficient 'to create a reasonable probability that the same person,' appellant, took part in each offense." *Id.* (quoting *Wright, supra,* 570 A.2d at 734). Thus, we concluded that the trial court did not abuse its discretion in denying the motion to sever.

Multiple offenses, pertaining to four different incidents, also were charged in *Coleman, supra.* As in the case before us, the incidents reflected similarities and dissimilarities. The similarities, summarized by the court, included "time, location, clothing, weapon, ... lone female victim entering a secured building; [ ] entry by the assailant into the secured building ... race, age, height, physique [and] eyes...." 619 A.2d at 45. Dissimilarities cited included the fact that the robberies took place in different settings (underground garage; apartment house lobby); the weapon was described variously as "a gold handled knife ... [and] a maroon one"; the sexual assault of one victim in her apartment; and "the robber asked to see the money in the victim's purse in one robbery, while he took the purse and ran in another." *Id.* We detected no abuse of discretion in the denial of the motion to sever, stating:

> The combination of these consistent features creates a unique picture which, when weighed against the variations cited, remain strongly convincing of the probability that the perpetrator of the crimes in each instance was the same. *See [Easton, supra,* 533 A.2d] at 904. It is not necessary for every detail of the crimes to be identical, nor that they share " 'any single factual characteristic that is compellingly unique.' " *Cox [v. United States ],* 498 A.2d [231,] 238 [D.C.1985] (citations omitted). The combination of circumstances of each crime must be compared. *Id.*

*Coleman, supra,* 619 A.2d at 45. "In making [the] comparison, [in Ifelowo's case, we seek to determine] the reasonable probability that [he] ..." was involved in all three robberies, with Shotikare. *Id.* at 46.

Ifelowo urges us to examine *Easton, supra,* in light of one facet of the trial court's rationale in denying Shotikare's motion to sever, which also would be applicable to Ifelowo's case—"the similar modus operandi of pulling up, jumping out,

robbing somebody on the street and hopping back in the car and leaving, kind of quick fear and violence sort of things." *Easton* presented a similar issue to the one before us, but in a different context. The issue was whether a prior robbery, of which the defendant had been convicted in 1981, could be introduced as evidence in a trial relating to a robbery which occurred in 1983. *Id.* at 906. Similar to its position in Ifelowo's case, the government "argued [in *Easton* ] that the circumstances of the prior crime were so similar to the [later] crime that there was a 'reasonable probability that the same person committed both crimes,' and thus that the evidence was admissible under the 'identity exception' set forth in *Drew, supra,* 118 U.S.App.D.C. at 16, 331 F.2d at 90." *Easton, supra,* 533 A.2d at 905. We disagreed, recognizing that, "[r]ulings in this area tend to be highly specific to the facts of each particular case...." *Id.* at 907. After setting forth the points of similarity and dissimilarity in *Easton,* "[w]e conclude[d] that the combination of circumstances surrounding the respective crimes do not create a reasonable probability that the same person committed both offenses." *Id.* at 909. We said that:

> Several of the circumstances cited by the government are, unfortunately, sufficiently commonplace that they add little weight to the government's argument. Robberies of middle-aged cab drivers during evening hours, for example, are not especially unusual occurrences, nor is the use of a sharp instrument in such a robbery. The other points of similarity ... do not add enough for us to conclude [that there is a reasonable probability that the same person committed both offenses] when we consider the differences between the two occurrences.

*Id.* at 909. We examined and "[w]eigh[ed] both the similarities and the differences between the two sets of circumstances" before concluding that the trial court committed error which was not harmless.[12] *Id.*

As we approach our task of discerning the points of similarity and dissimilarity concerning the three incidents resulting in the charges against Ifelowo, we are mindful that this determination is fact specific. *See Easton, supra,* 533 A.2d at 907. We also recognize that we must weigh the combination of the consistent features of each incident versus the variations, *Coleman, supra,* 619 A.2d at 45; and in doing so, pinpoint any "striking differences," *Easton, supra,* 533 A.2d at 908. The combination of consistent features of all three incidents includes the following:

(1) They took place between 9 and 10 p.m. in the month of February, within a nine-day period.

(2) They occurred within reasonable geographic proximity.

(3) At least one witness described the get-away car as an older model, light-colored (silver or gray or whitish) hatchback.

(4) Two men were present at each incident; they drove up, confronted and robbed an isolated or vulnerable person(s), and drove away.

The combination of additional consistent features in two of the incidents included the following:

(1) Both robbers were described as "tall and thin." (Robbery No. 2 and No. 3).

---

**12.** We listed seven similarities and six "striking differences." *Easton, supra,* 533 A.2d at 908–09.

(2) The license tag of the car was identified as covered with cardboard (Robbery No. 1 and No. 3).

(3) A foreign accent was detected in the speech of at least one robber. (Shotikare in Robbery No. 1 and both men in Robbery No. 3).

(4) The victims were threatened by a hand in at least one robber's pocket and a reference to violence or a gun. (Shotikare in Robbery No. 1—right hand in jacket pocket raised toward victim's head and a threat to blow victim's head off; Shotikare and Ifelowo in Robbery No. 2—hands in pocket, said it was a gun and demanded hand bag).

(5) The perpetrators acted normally in leaving the scene of the crime. (Robbery No. 1—Shotikare "walked" back to the car; Robbery No. 2—the men drove away "normally," not in a hurry).

There are also differences in the three incidents:

(1) The driver of the car in Robbery No. 1 (presumably Ifelowo), who never left the get-away car, was described by the victim as a black man with a moustache and "fairly prominent cheek bones." This type of description was not mentioned by the victims in Robbery No. 2 and No. 3; and the driver of the vehicle involving these two robberies exited the vehicle and participated directly in the crime.

(2) The victim of Robbery No. 2 did not detect an accent in the voices of the assailants, but had difficulty understanding their soft tones.

(3) Neither the victim nor the witness to Robbery No. 2 mentioned a cardboard license plate.

(4) A knife was used in Robbery No. 3 and pointed at one victim's stomach.

(5) The assailants in Robbery No. 3 used knit caps.

■ Based upon "the totality of the factual circumstances ...," *Bond, supra,* 614

A.2d at 897 (quotation omitted), and despite the differences among the three robberies, the combination of consistent features with respect to them satisfies us that the trial court did not abuse its discretion by concluding that there is a reasonable probability that the same persons committed all three robberies, and by denying Ifelowo's motion to sever the robbery counts. All of the robberies involved the threat of force, whether the suggestion of a gun in the pocket or a knife to compel the victims to submit. They occurred between the hours of 9 and 10 p.m. in the evening. All took place within reasonable geographic proximity, from Vermont and K Streets, N.W. to 31st and N Streets, N.W. The perpetrators used a similar tactic—drove up, confronted and robbed an isolated or or vulnerable person(s), and drove away. The vehicle used in all the robberies was described, consistently, as light-colored, small, and a hatchback.

We recognize that there were differences among the three robberies, especially with respect to the first robbery. For example, both assailants in the third robbery only were described as having knit caps. In addition, the description of the driver of the car in Robbery No. 1 was unique when compared with the description of the assailants in Robbery No. 2 and 3; and the driver of the getaway car in Robbery No. 1 never got out of the vehicle, while the driver in the second and third robberies exited the vehicle and participated directly in those robberies. Furthermore, the driver of the car during the first robbery never spoke, and therefore, nothing indicates that he had an accent, as did the robbers in the third incident and the other assailant in the first robbery.

■ However, we have said previously that: "It is not necessary for every detail of the crimes to be identical, nor that they share any single factual characteristic that is compellingly unique." *Cole-*

*man, supra,* 619 A.2d at 45 (internal quotations and citations omitted). Applying these principles, and others set forth above, we hold that the combination of consistent features of each of the three robberies, outweighed the variations, and that any striking differences were cured by the rebuttal testimony of the other robber, Shotikare, who implicated Ifelowo in all three incidents. In short, we are satisfied that there is "a reasonable probability that the same person[s] committed each," *Bond, supra,* 614 A.2d at 897 (inter-

nal quotations and citations omitted); and that Ifelowo has not made "a clear showing of abuse of discretion" by the trial court in joining the counts for trial, *Bright, supra,* 698 A.2d at 454. Nor has he shown "the most compelling prejudice from which the court would be unable to afford protection if ... offenses were tried together...." *Id.*[13]

Accordingly, for the foregoing reasons, we affirm the judgments of conviction.

*So ordered.*

13. We are unpersuaded by Ifelowo's remaining arguments. He challenges rulings of the trial court which he asserts "unfairly shielded [ ] Shotikare's credibility from defense attack, while permitting the government to bolster his credibility with reference to "his rejection of a deal the defense knew nothing about." Ifelowo argues that this ruling prevented him from probing Shotikare's credibility, and also enabled the government to bolster the credibility of Shotikare by showing that he rejected the government's deal and was remorseful about his involvement in the three robberies. Furthermore, Ifelowo maintains that the bolstering of Shotikare's testimony was aided by the trial court's omission of part of the standard jury instruction concerning an immunized witness.

On direct examination of Shotikare, the prosecutor elicited testimony that the government had made "a promise" regarding Shotikare's sentencing. Shotikare stated, however, that he had rejected the government's offer and did not ask for details; and that, "[he] didn't want his life saved at the expense of [Ifelowo's] life." Shotikare also denied any government promises or "assurances" after he "refused to testify voluntarily...."

Although the trial judge had left the door open to revisiting the cross-examination issue after Shotikare's direct examination, defense counsel proceeded with cross-examination without further questioning the trial judge's ruling. On cross-examination, Shotikare acknowledged that if he had refused to testify after being granted immunity, he could have been charged with contempt and obstruction of justice.

During part of his closing argument, the prosecutor pointed out that Shotikare had refused the government's "promise" or "assurances." In response, defense counsel's

closing argument suggested that Shotikare was protecting himself in a prison culture that, in essence, looked down on an inmate who testified against a defendant, or implicated yet another individual. Furthermore, defense counsel argued that the jurors' "common sense and experience should tell [them] that [Ifelowo's] not getting away with this with nothing. He's getting something out of it."

Based upon our review of the record, we discern no abuse of discretion in the trial court's ruling that precluded cross-examination regarding the government's "promise," about which Shotikare knew no details. "Impeachment evidence is not material if the witness does not have knowledge of the underlying fact." *Williams v. Scott,* 35 F.3d 159, 162 (5th Cir.1994) (citations omitted). Furthermore, Ifelowo was not foreclosed from all efforts to impeach Shotikare's credibility or to expose his bias. Indeed, Ifelowo acknowledges, in his main brief, that: "The trial court did not completely preclude the defense's exploration of [ ] Shotikare's motive for implicating [ ] Ifelowo...."

It is axiomatic that a defendant does not have an unfettered right to cross-examination. *See Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985). The limits of cross-examination fall within the sound discretion of the trial judge. *See Brown v. United States,* 683 A.2d 118, 124 (D.C.1996).

Since Shotikare, who had already been convicted of the crimes with which Ifelowo also was being tried, testified that he did not know the details of the government's "promise" to him, there was nothing to disclose, and contrary to Ifelowo's position, *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d

GLICKMAN, Associate Judge, with whom SCHWELB, Associate Judge, joins, concurring:

I am pleased to join the opinion of Judge Reid and would add the following. The central issue in this case is whether proof of Ifelowo's participation in two of the robberies tended to prove that he also participated in the third. I think it did. The three crimes exhibited the *same* modus operandi—in each, two robbers drove up, confronted vulnerable pedestrians, robbed them and drove off. The two robbers drove the *same car* in all three incidents. The second robber was the *same person* (Shotikare) in all three incidents. And the three incidents occurred in the *same* general vicinity at about the *same* time of night, within a span of just nine days. A pattern emerges: same offense, same number of robbers, same method, same car, same accomplice, same area of the city, same time of day, in three crimes occurring one right after the other. Dissimilarities were minor; overall, the three incidents were strikingly similar and evidently related to each other. That is why, to my mind, the proof that Ifelowo was Shotikare's confederate in two of these incidents logically made it more likely that Ifelowo was Shotikare's confederate in the third.

104 (1972), which concerned a government promise made to an unindicted co-conspirator, is inapplicable to Ifelowo's case.

Finally, we are satisfied that the trial court's instructions pertaining to the testimo-

ny of an accomplice and of an immunized witness fell within the sound discretion of the trial judge. *See Pryor v. United States,* 503 A.2d 678, 683 (D.C.1986); *Sherer v. United States,* 470 A.2d 732 (D.C.1983).