**Donald BATES, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 08–CF–913.

District of Columbia Court of Appeals.

Argued Sept. 20, 2011.

Decided Sept. 6, 2012.

---

**504**

Kyle A. McGonigal, Washington, for appellant.

Katherine M. Kelly, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, and Elizabeth Trosman and Jennifer A. Kerkhoff, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and OBERLY, Associate Judges, and KING, Senior Judge.

GLICKMAN, Associate Judge:

A jury convicted appellant, Donald Bates, of three counts of robbery and one count of credit card fraud. Two of the robberies, both of them purse snatchings, were committed on consecutive days in March 2006. The third robbery, also a purse snatching, and the fraudulent use of the victim's credit card occurred on the same day in September 2007.

On appeal, though appellant does not challenge his conviction for the 2007 robbery, he seeks reversal of his convictions for the 2006 robberies and for credit card fraud. He makes two principal claims. First, appellant contends, the trial court abused its discretion in denying his severance motion, in which he sought a separate trial on the 2006 charges. The court found that severance was unwarranted because the evidence of appellant's participation in the 2007 robbery would help prove his identity as one of the perpetrators of the prior offenses. Second, appellant asserts, the court erred in denying his motion to suppress incriminating admissions he made when police interrogated him about the 2006 robberies without giving him *Miranda* warnings. The court denied the motion because appellant was not in police custody when the interrogation took place. In addition to the foregoing claims, appellant also challenges the sufficiency of the evidence, the aiding and abetting instruction, and the court's response to an inquiry from the deliberating jury.

We uphold the trial court's rulings on appellant's motions, and we conclude that appellant's remaining claims lack merit. Accordingly, we affirm appellant's convictions.

## I. Factual Background

### A. The 2006 Robberies

The first robbery occurred on the evening of March 10, 2006. As Bibi Doobay was walking home, a man passed her on the sidewalk and then turned around and grabbed the purse off her shoulder from behind. Doobay described the robber as African–American and relatively short. After he snatched her purse, she saw him enter the passenger side of a large, older-model Buick or similar vehicle, which drove away. Two witnesses to the robbery called 911 and reported that the car

had a D.C. license plate with the number BX–5228. One of those witnesses described the purse snatcher at trial as a young African–American man, around five feet ten inches tall, and the getaway car as an old, large, boxy vehicle being driven by an African–American male. Shortly after the robbery, a stolen credit card in Doobay's purse was used to purchase gasoline at a gas station.

The second robbery occurred the next day. As Andrea Gudeon walked home from a Safeway grocery store, someone ran up behind her, grabbed her tote bag off her shoulder, and then jumped into the passenger side of an older-model car. As the car sped off, Gudeon saw that its license plate number was BX–5228. Gudeon described the robber as a non-Caucasian man, about five feet nine inches tall, who was wearing a hat or a hood. She could not provide a description of the driver of the getaway vehicle. The stolen bag contained some groceries, Gudeon's cell phone, and her wallet, which held cash, credit cards, grocery store discount cards, and the security card to Gudeon's office building. Later on the day of the robbery, Gudeon's stolen credit cards were used at two different gas stations.

Through the license plate number, the police identified the getaway car in the two purse snatchings as a 1986 Buick Regal belonging to Margaret Bates, appellant's mother. On the night of March 11, 2006, police found the vehicle parked on the street. They put it under surveillance, and at around 4:30 the following morning, they saw appellant approach the car. Detective Neil Jones, accompanied by other officers, stopped him and informed him that they believed the car had been used in connection with criminal activity in the last few days. Appellant responded that the "vehicle couldn't have been involved in anything illegal because it was in his pos-session the whole time. . . . he[ was] the only one that had possession of this vehicle-his mother's vehicle." (At trial, appellant's mother testified that appellant had primary use of the car, that she had not given anyone else permission to drive it, and that her son did not have any other car.)

The police seized the Buick and had it towed to an evidence bay to be searched. Before they moved the car, appellant asked if he could retrieve his jacket from the passenger compartment. Detective Jones did not allow him to do so. Upon searching the car, the police recovered Bibi Doobay's cell phone from the pocket of the jacket, along with a piece of paper bearing appellant's name. They also recovered Andrea Gudeon's security card from the front passenger floor board, and a tote bag containing two bags of Safeway groceries. Appellant was arrested when he subsequently visited the police station to retrieve the car. In a search of his person incident to his arrest, the police found Gudeon's grocery store discount cards.

### B. The 2007 Robbery and Credit Card Fraud

The third purse snatching was on September 22, 2007. As Loren Bausell was walking down the street alone, she noticed a car—which she identified as an older Buick or Oldsmobile—stop in the middle of the street. A man exited the car from the passenger side. When Bausell made eye contact with him, the man bent over to inspect the car's tire. She kept walking, but then heard the car pull up behind her. The man she had just seen jumped out of the passenger side of the car, ran at her while screaming obscenities, threw her to the ground, and grabbed her purse. He then reentered the car on the passenger side. As the vehicle drove off, Bausell

took note of its licence plate number: BX–5228. She also saw that the driver was a woman. Several hours after the robbery, Bausell identified appellant from a police photo array as the man who had knocked her down and stolen her purse. (At trial, she identified appellant in person.)

One of Bausell's stolen credit cards was used at a gas station on the day of the robbery. A detective visited the station that afternoon and viewed a video which showed a car pulling into the station and parking at a pump at the same time Bausell's card was used. The station attendant told the detective that she recalled the car vividly because she saw a man and woman kissing inside it.

That same day, the police, having obtained a warrant for appellant's arrest, went to his house. Appellant's mother told them he was not there, and that he had her car.[1]

## II. Denial of Severance

██ Appellant claims the trial court abused its discretion in denying his motion for severance because the evidence that he committed the 2007 purse snatching unfairly prejudiced his ability to defend against the 2006 robbery charges. The trial court acknowledged the possibility that the jury might engage in improper propensity reasoning and find that, because appellant committed a purse snatching in 2007, he was likely to have done it in 2006 as well. However, the court concluded, because the same car was used as the getaway vehicle in all three robberies (as shown by its license plate and other indications), the evidence that appellant used it to commit the 2007 purse snatching would be admissible to prove his identity as the perpetrator of the 2006 purse snatchings even if the charges were tried separately. That would be so even though there were a few differences in how the three robberies were committed; the identity of the car outweighed those differences. Accordingly, the court concluded, the charges "should be tried together rather than having two or three separate trials in which virtually the same evidence would come in, albeit sanitized somewhat." We hold that the court did not abuse its discretion in reaching that conclusion.

██ The charges against appellant were properly joined under Criminal Rule 8(a).[2] Criminal Rule 14 provides that the court has discretion to order separate trials of properly joined counts if it appears that the defendant or the government would be prejudiced by the joinder. "[T]he trial court's discretionary judgment regarding whether to grant a severance motion is entitled to great deference, and 'may be reversed only upon a clear showing of abuse of discretion.'"[3] In order to establish abuse of discretion, a defendant typically "must show the most compelling prejudice, from which the court would be unable to afford protection if both offenses were tried together."[4] This means the defendant must do more than merely show

---

1. Appellant was arrested, and the car was located, a few days later. Bausell's belongings were not recovered.

2. Superior Court Criminal Rule 8(a) provides that two or more offenses may be jointly tried if the offenses "are of the same or similar character or are based on the same act or transaction or on [two] or more acts or transactions connected together or constituting parts of a common scheme or plan." This rule is "construed broadly in favor of initial joinder." *Sweet v. United States*, 756 A.2d 366, 375 (D.C.2000).

3. *Bailey v. United States*, 10 A.3d 637, 642 (D.C.2010) (quoting *Winestock v. United States*, 429 A.2d 519, 526 (D.C.1981)).

4. *Bailey*, 10 A.3d at 642 (internal quotation marks omitted).

he will stand "a better chance of acquittal" if the charges are tried separately.[5]

■ We recognize "the possibility of prejudice whenever similar offenses are joined in a single indictment of a single defendant[.]"[6] Courts therefore strike a balance. "When joinder is based on the 'similar character' of the offenses, a motion to sever should be granted unless (1) the evidence as to each offense is separate and distinct, and thus unlikely to be amalgamated in the jury's mind into a single inculpatory mass, *or* (2) the evidence of each of the joined crimes would be admissible at the separate trial of the others. This means if the denial of severance can be sustained on either ground, it will not be disturbed on appeal."[7]

■ The second ground, commonly referred to as reciprocal or mutual admissibility, "recognizes that the joinder for trial of two crimes does not unduly increase the likelihood that the jury will infer a criminal disposition when the rules of evidence would have permitted the admission of evidence of each crime at the separate trial of the other."[8] As the trial court recognized, evidence of other crimes is admissible under the rules of evidence when, *inter alia*, it is relevant to "the identity of the person charged with the commission of the crime on trial."[9]

In this case, appellant claims prejudice only with respect to his defense to the 2006 charges. We therefore confine our inquiry to whether, as the trial court concluded, the evidence that appellant committed the 2007 robbery was relevant to prove his identity as one of the perpetrators of the 2006 offenses. That was a material issue at trial, so the " 'question remaining' " is simply whether the evidence had probative value.[10]

■ Generally speaking, a trial judge may determine that evidence of another offense is sufficiently probative to be admitted under the identity exception when " 'there is a reasonable probability that the same person committed both crimes due to the concurrence of unusual and distinctive facts relating to the manner in which the crimes were committed.' "[11] For that standard to be met, "[i]t is not necessary that the crimes be identical in every detail nor that they share any single unique characteristic. There need only be enough points of similarity in the combination of circumstances to make it reasonably probable that the same person committed all of the offenses."[12] Conversely, other crimes evidence will be found inadmissible "when the combination of circumstances is not sufficiently distinctive that there is a 'logi-

5. *Id.* at 642–43.

6. *Id.*

7. *Arnold v. United States*, 511 A.2d 399, 404–05 (D.C.1986) (footnote, citations and internal quotation marks omitted).

8. *Cox v. United States*, 498 A.2d 231, 237 (D.C.1985) (citing *Drew v. United States*, 331 F.2d 85, 90 (D.C.Cir.1964)).

9. *Drew*, 331 F.2d at 90 (adding that "[w]hen the evidence is relevant and important to one of these ... issues, it is generally conceded that the prejudicial effect may be outweighed by the probative value").

10. *Coleman v. United States*, 619 A.2d 40, 44 (D.C.1993) (quoting *Easton v. United States*, 533 A.2d 904, 906–07 (D.C.1987)).

11. *Cox*, 498 A.2d at 238 (quoting *Drew*, 331 F.2d at 90); *see also Ifelowo v. United States*, 778 A.2d 285, 290 (D.C.2001) ("The applicable standard is whether the crimes are so nearly identical in method that it is likely that the present offense had been committed by the defendant." (internal quotation marks omitted)).

12. *Coleman*, 619 A.2d at 44 (citation omitted).

cal basis ... to assume that whoever did one [crime] did the other.' " [13]

In the present case, there were similarities between the three robberies. In each one there was a principal robber and a getaway driver; the driver remained in the car during the robbery; the victim was a woman walking alone; the robber grabbed her purse or bag from her shoulder and then immediately got into the passenger side of the getaway car, which drove off; and, within a short time, the victim's credit card was used to purchase gas at a gas station. Finally, and most notably, the getaway car in each robbery bore the same license plate.

There also were some differences. The witnesses' descriptions of both the assailant and the getaway driver varied somewhat (notably, the driver was a man in the first 2006 robbery and a woman in the 2007 robbery). The 2007 robbery was more violent than the other two robberies. Most significantly, perhaps, the robberies were not all committed around the same time; the 2007 robbery occurred eighteen months after the 2006 robberies.

Nonetheless, we are persuaded that the similarities outweigh the differences

enough to support a reasonable probability that, if appellant committed the 2007 robbery, he also was involved in the two earlier crimes. The crucial "consistent feature" present here is the identification of the getaway car in each robbery through the license plate number BX-5228. That the same car was used in each robbery was *prima facie* evidence that the same person (whoever it might be) was involved in each robbery.[14] That might not have been so if there had been a change in the ownership, possession, or use of the car in the interim between the first two robberies and the third. But the evidence showed there had not been such a change in this case; at all relevant times, the car was linked strongly to appellant and only appellant.[15] Given those facts, and the other similarities we have noted in the three purse snatchings, we conclude that appellant's identification as the perpetrator of the 2007 robbery by an eyewitness was legitimately and significantly probative of his identity as one of the perpetrators of the 2006 robbery as well.[16]

### III. Suppression of Appellant's Statements

We turn next to appellant's contention that the trial court should have

---

**13.** *Easton,* 533 A.2d at 908 (alteration in original) (quoting *Settles v. United States,* 522 A.2d 348, 355 (D.C.1987)).

**14.** Compare the present case with *Cox,* 498 A.2d at 237–38, and *Ifelowo,* 778 A.2d at 293–95, two cases where we upheld the denial of severance because the similarities made it reasonably probable that the same individual committed each of the charged offenses. In *Cox,* we found it significant that the defendant's car was identified as the vehicle used by the assailant in the commission of two rapes within days of one another in the same area. In *Ifelowo,* we attached significance to the use of the same distinctive getaway car in the commission of three robberies over a nine-day period.

**15.** This evidence also served to neutralize the main countervailing consideration, the eigh-

teen-month hiatus between the first two robberies and the third robbery.

**16.** We are not persuaded by appellant's alternative assertion that the legitimate probative value of the other crimes evidence was substantially outweighed by the risk of unfair prejudice. The only claim of prejudice that appellant identifies is the possibility that the jury would infer a "criminal propensity" on his part and convict him of the 2006 robberies on that basis. But this risk alone is not enough to outweigh the substantial, legitimate probative value of the evidence that appellant committed the 2007 robbery (particularly, we may add, in light of the other, circumstantial evidence linking appellant to the 2006 offenses).

suppressed his statements to Detective Jones on the morning of March 12, 2006, because he was not given *Miranda* warnings.[17] At the hearing on appellant's motion to suppress those statements, Jones testified that he and other police officers had been watching appellant's mother's car for several hours when, at about 4:30 in the morning, appellant approached the vehicle. The officers immediately surrounded the car with two or three police cruisers so that appellant could not drive away. Appellant was standing outside the car when Jones confronted him. There were "at least two" uniformed officers on the scene, along with some officers in plain clothes. Jones told appellant that the police were "looking at the vehicle" and conducting an investigation because they believed the car had been "involved in some criminal activity" within the past "day or two." In response to Jones's questions, appellant stated that "it couldn't have been that vehicle because he had been in possession of it the entire time." Appellant told Jones he had been visiting a friend nearby and had just left, and when Jones asked appellant to wait while he confirmed this, appellant said "okay." Jones stated that he never told appellant that he was under arrest or that he could not leave. At no time was appellant handcuffed or physically restrained. Jones acknowledged telling the other officers to "keep an eye on" appellant until he returned. But according to Jones, appellant never said that he did not want to wait; rather, he was cooperative and said that he had not been involved in any criminal activity and that he wanted to clear things up.

Jones testified that he was at the apartment of appellant's friend for "at least 30 minutes." During that time appellant waited at the car. When Jones returned, he told appellant the police were going to seize the car, and he again asked appellant if he had been involved in any criminal activity. Appellant said no, and that no one else had been driving the car. Appellant asked Jones if he could take his jacket from the car, and Jones told him that he could not. Jones gave appellant his business card and told appellant that his mother could call Jones if she had any questions. Jones also asked if he could call appellant with further questions, and appellant agreed he could. Appellant then left the scene on foot.

Appellant described the encounter differently. He testified that as he approached the car, several uniformed police officers approached him with their "lights flashing," frisked him, did not inform him what was going on, and began questioning him about where he was coming from. Appellant testified that Jones questioned him for about 20 minutes and that he told Jones he had possession of the car. After Jones questioned him, appellant claimed, he "was made to sit on the sidewalk for at least two-and-a-half or three hours" while the police confirmed that he had just come from a friend's apartment. Jones told the officers to make sure appellant did not leave. Appellant testified that he did not believe he had the right to leave or to refuse to answer questions.

The trial court found Jones to be the more credible witness.[18] While the experi-

---

17. *See Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (holding that before the police may interrogate a suspect in custody, they must warn him "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of

an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires").

18. *See Resper v. United States,* 793 A.2d 450, 457 (D.C.2002) ("It is clearly within the province of the trial court to make the credibility

ence might have been "very unpleasant" for appellant, the court stated, there was no evidence of circumstances "that would have made [appellant] feel that he was being placed under arrest." Additionally, the court noted, all of appellant's statements "seem[ed] to have come before he was made to sit on the curb." [19] The court found that appellant had not been handcuffed or searched, that he was never told he was under arrest, and that his conversation with Jones had been "consensual." Although the trial court credited appellant's statement that he did not feel free to leave when Jones left to confirm his story, it found that a reasonable person in appellant's circumstances would not have thought he was under arrest. Accordingly, the court found that appellant was not in "custody" within the meaning of *Miranda* and that no *Miranda* warnings were required.

 We uphold the trial court's determination.[20] *Miranda* warnings are required only when a suspect is subjected to custodial interrogation. That appellant was stopped for investigative purposes is not enough to establish that he was in custody for purposes of *Miranda*, even " 'if a reasonable person would not have thought himself free to leave' " in the circumstances.[21] Custody requires more than that—either a "formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest." [22]

It is undisputed that appellant was not placed under formal arrest at the time he made the admissions at issue. And even if he may have been seized within the meaning of the Fourth Amendment, we agree with the trial court that the circumstances of this encounter would not have caused a reasonable person to "believe he was in police custody of the degree associated with formal arrest." [23] Appellant was neither handcuffed nor physically restrained in any way,[24] nor was he searched. There is no evidence that Jones or any of the other officers on the scene brandished any weapon or made any show of force.[25] Jones did not confront appellant with "obvious evidence of [his] guilt," [26] and it does

---

determinations needed to resolve conflicts in witnesses' testimony.").

19. The main exception was appellant's request to be allowed to retrieve his jacket.

20. While we accept the trial court's findings of historical fact unless they are clearly erroneous, and view the facts and the reasonable inferences from them in the light most favorable to sustaining the court's ruling, our review of the court's legal conclusion that appellant was not in custody is *de novo*. *See Resper*, 793 A.2d at 456.

21. *Graham v. United States*, 950 A.2d 717, 728 (D.C.2008) (quoting *In re I.J.*, 906 A.2d 249, 256 (D.C.2006)).

22. *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); *see also Morales v. United States*, 866 A.2d 67, 73 (D.C.2005) ("But though this may have been a seizure within the meaning of the Fourth Amendment, 'seizure' and 'custody' are not synonymous. Under *Berkemer* [*v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) ], the question [in a custody inquiry] is *not* whether a reasonable person would believe he was not free to leave, [but] rather whether such a person would believe he was in police custody of the degree associated with formal arrest." (internal citations and quotation marks omitted) (alterations in original)).

23. *Morales*, 866 A.2d at 73.

24. *See, e.g., id.* at 72 (noting that the fact that the suspect was not handcuffed or otherwise physically restrained weighed in favor of finding an encounter to be non-custodial).

25. *See id.*

26. *In re I.J.*, 906 A.2d at 261. Jones simply told appellant that the police were investigating the car relating to some criminal activity in the past few days, asked appellant where

not appear that the questioning "contribute[d] materially to an atmosphere of coercion and custody."[27] Finally, although appellant emphasizes the length of time he spent sitting on the curb while waiting for Jones to return, the length of the encounter alone is not enough to render it custodial in nature.[28] (Furthermore, as the trial court noted, virtually all of appellant's statements were made before he waited on the curb for Jones's return.) For these reasons, we are satisfied that, while appellant's freedom of movement may have been restrained temporarily, he was not in custody for purposes of *Miranda.* Thus the trial court did not err in denying appellant's motion to suppress.

## IV. Remaining Claims

Appellant's remaining claims do not call for extended discussion.

■■■■ First, viewing the evidence, as we must, in the light most favorable to sustaining the jury's verdict,[29] we reject appellant's contention that there was insufficient evidence identifying him as one of the perpetrators of the 2006 robberies.[30] His participation in those robberies as either the principal offender or an aider and abettor (i.e., the driver of the getaway

car)[31] was proven circumstantially by the following facts: the getaway vehicle in both robberies was identified by its license plate as appellant's mother's car; both appellant and his mother confirmed that he used the car at the time of the robberies; when the police searched the car, they found Gudeon's tote bag and security card and, in the pocket of appellant's jacket, Doobay's cell phone (and a piece of paper bearing appellant's name); Gudeon's grocery store discount cards were found in appellant's wallet at the time of his arrest; and appellant was positively identified as the man who robbed Bausell of her purse in 2007 (which was probative of his involvement in the earlier robberies for the reasons explained above).

■■■ We also reject appellant's argument that, in contravention of our ruling in *Wilson–Bey v. United States*[32] and subsequent cases, the trial court's instructions on aiding and abetting permitted the jury to find him guilty as an aider and abettor without finding that he had the specific intent necessary to commit the charged offenses. As appellant did not object to the instructions on this ground, he must show plain error to prevail on this claim. That he cannot do. Unlike the instruc-

---

he was coming from and how long he had been there, asked if he could confirm appellant's answer, and eventually told appellant he was taking the car and that appellant's mother should call if she had any questions.

27. *Morales*, 866 A.2d at 72.

28. *See, e.g., Morris v. United States*, 728 A.2d 1210, 1213–14 (D.C.1999) (finding four-and-one-half-hour interrogation non-custodial); *Johnson v. United States*, 616 A.2d 1216, 1230 (D.C.1992) (same).

29. *Busey v. United States*, 747 A.2d 1153, 1160 (D.C.2000).

30. Appellant also argues that the evidence was insufficient to permit his conviction as an aider and abettor because the prosecution did

not prove the identity of the principal. But proof of the principal's identity was not required. *See Lancaster v. United States*, 975 A.2d 168, 174 (D.C.2009).

31. Appellant did not object to the instruction on aiding and abetting liability with respect to the 2006 robberies, and we perceive no plain error, or error at all, in the giving of such an instruction. Where there is evidence of both a principal and an aider and abettor, and a question exists as to which role the defendant played, an aiding and abetting instruction is appropriate. *See, e.g., Head v. United States*, 451 A.2d 615, 626 (D.C.1982).

32. 903 A.2d 818, 830 (D.C.2006) (en banc).

tions we have disapproved, the instruction here did not contain the "natural and probable consequences" language that told the jury an aider and abettor need not have shared the principal's *mens rea*.[33] Rather, the trial court informed the jury, "[t]o find that a person aided and abetted in committing a crime, you must find that the defendant knowingly associated himself with the commission of the crime, that he participated in the crime as something he wished to bring about, and that he intended by his actions to make it succeed." We have held that the failure to inform the jury more explicitly that an aider and abettor must also possess the *mens rea* that is an element of the offense is not plain error.[34]

 Finally, appellant complains of the court's response to a question from the deliberating jury concerning the 2007 credit card fraud charge. The court's initial aiding and abetting instructions referred only to the 2006 robberies. During deliberations, however, the jury sent a note inquiring whether appellant could be found guilty of the credit card offense if he had not used the card himself. In response, after discussing the matter with counsel, the court referred the jury to the earlier aiding and abetting instruction. This was an appropriate exercise of the court's discretion. "[B]y giving the supplemental instruction [on aiding and abetting], the trial court simply clarified the law for a jury which was experiencing difficulties."[35] As

the judge stated, there unquestionably was sufficient evidence for the jury to infer that appellant either used the credit card himself to purchase gas, or else gave it to his accomplice to do so. In the latter case he might have been guilty of credit card fraud as an aider and abettor rather than as a principal. Appellant did not ask for permission to present additional argument to the jury on this issue.[36] Under these circumstances, we perceive no error in the court's response to the jury's inquiry.

## V. Conclusion

For the foregoing reasons, we affirm appellant's convictions and the judgment of the Superior Court.

*So ordered.*

---

**33.** *See id.* at 845.

**34.** *See Paige v. United States,* 25 A.3d 74, 89 (D.C.2011) ("[W]here the jury was properly instructed on the elements of second-degree murder and intent, the failure to expressly inform the jury that an aider and abettor must possess the same *mens rea* as the principal was not plain error." (internal quotation marks omitted)); *Fox v. United States,* 11 A.3d 1282, 1288–89 (D.C.2011) (similarly finding no plain error where appellant was convicted of armed robbery as an aider and abettor); *Appleton v. United States,* 983 A.2d 970, 978

(D.C.2009) (reviewing the same instruction and finding "no reason why this instruction would allow a jury to convict a defendant [of assault with intent to kill and other specific intent offenses] under an aiding and abetting theory without finding that he had the required *mens rea* ").

**35.** *Bouknight v. United States,* 641 A.2d 857, 860 (D.C.1994).

**36.** *See Atkinson v. United States,* 322 A.2d 587, 589 (D.C.1974).