Melvin L. FERGUSON, Appellant

v.

UNITED STATES, Appellee.

No. 05–CF–15.

District of Columbia Court of Appeals.

Submitted March 27, 2008.
Decided Aug. 13, 2009.

---

**46.** The court wishes to express its appreciation and respect for the outstanding work performed by appointed counsel in briefing and arguing this case.

Mindy A. Daniels, appointed by this court, was on the brief for appellant.

Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese, III, Lisa H. Schertler, Denise M. Clark, and Allison L. Barlotta, Assistant United States Attorneys, were on the brief for appellee.

Before GLICKMAN and THOMPSON, Associate Judges, and TERRY, Senior Judge.

TERRY, Senior Judge:

Appellant was convicted of assault with intent to kill while armed (AWIKWA), aggravated assault while armed (AAWA), and simple assault. On appeal from those convictions, he argues (1) that the trial court erroneously denied his *pro se* motions to dismiss the indictment for lack of a speedy trial, and (2) that the court abused its discretion by allowing the government to introduce evidence of his post-crime conduct to demonstrate consciousness of guilt. We affirm.

## I

### A. *The Government's Evidence*

On the evening of December 11, 2003, appellant and his then-fiancée Sheila Rainford were at the home of Ms. Rainford's daughter on Southern Avenue, S.E. While discussing the possibility of getting an apartment of their own, appellant suggested that Ms. Rainford call her friend, Louis Gaston, to ask if he would be willing to let Rainford use his address to secure Section 8 housing.[1] Ms. Rainford agreed and called Mr. Gaston while appellant was still in the room. Gaston suggested to Rainford that she come to his home to discuss the issue further.

Ms. Rainford's daughter drove her to Gaston's home, and when she arrived, she called appellant to let him know she was there. She then handed the phone to Mr. Gaston, who had expressed an interest in having appellant paint his house. Ms. Rainford heard Gaston tell appellant, "Oh no, no, no, it's not like that. The girl really loves you, you know."[2]

Shortly after this conversation, appellant showed up at Gaston's house just as Rainford was getting ready to leave. Ms. Rainford testified that appellant appeared to be very angry. He took a half-pint bottle of vodka from Rainford and "drank it down, all of it, straight." Appellant then demanded that Ms. Rainford return the engagement ring he had given her, and threatened to "kick her ass" and end their relationship if she did not leave Gaston's home with him. Gaston tried to talk to appellant, referring to him in derogatory terms. Apparently upset by Gaston's choice of words, appellant hit him in the head, knocking him unconscious.[3] Gaston

1. *See Peart v. District of Columbia Housing Authority,* 972 A.2d 810, 812 (D.C.2009) (describing the "Section 8" program of government-subsidized housing assistance).

2. Mr. Gaston and Ms. Rainford both admitted that they had had sexual relations, but their recollections differed as to when that happened. Ms. Rainford testified that the two of them became sexually involved after the assaults for which appellant was on trial. Mr.

Gaston testified that they had only one sexual encounter shortly after they met, but before Ms. Rainford was stabbed.

3. Gaston's and Rainford's testimony concerning the assault on Gaston was inconsistent. Rainford said that appellant struck Gaston, and that she and appellant then left the house together. Gaston testified that appellant and Rainford left together, but that appellant returned later and struck him in the head.

suffered injuries to his left eye, which was swollen shut and bled significantly.

Appellant and Ms. Rainford left Gaston's house, but Rainford returned shortly thereafter to check on Gaston. She found him just as he was regaining consciousness. She called her daughter and asked to be picked up, but her daughter refused to come. Appellant then returned to Gaston's house, and he and Rainford left together. As they were walking out the front door, appellant turned and stabbed Ms. Rainford under her right breast with a "butterfly knife." When Rainford asked him why he had stabbed her and told him to leave her alone, appellant stabbed her again in the face, causing lacerations to her mouth and tongue. Ms. Rainford could not recall what happened after that, but she was "absolutely positive" that appellant was the person who stabbed her. She also admitted in her testimony that she had been drinking that evening.[4]

Tanya Latson, a neighbor of Mr. Gaston, was getting ready for bed that evening when she heard a woman's voice shouting, "Don't kill me, I love you." Ms. Latson looked out her living room window toward the alley down the street and saw a man wearing a work jacket striking a woman who appeared to be on her knees pleading with him. Ms. Latson called the police and then went upstairs to bed. Moments later, Ms. Latson heard more yelling, and when she went back to the window, she saw the same man kicking the same woman in the head, next to a brick wall. Ms. Latson called the police again and "told them they would need to bring an ambulance." She saw the man walking back and forth from the woman's body to a nearby hill, and believed he was trying to "drag her by the arm." The woman was not moving and appeared to be uncon-

scious, and bleeding as well. The man fled when the police approached and their sirens became audible.

Sheela Long Weems, who also lived nearby, was watching television and trying to put her son to sleep when she heard a man shouting obscenities outside her window. Ms. Weems looked out the window and saw a man kicking something and "putting his back, his whole body, into every kick that he took." When she went out the front door to see what was going on, she saw a man kicking a partially clothed woman in the alley next to her home. Ms. Weems asked, "What the [expletive] are you doing?" He responded, "This drunk bitch," and continued to kick the woman. Ms. Weems turned and started to go back inside to call the police, but they were already on their way.

Metropolitan Police Officer Stuart Emerman was the first officer to respond. When he arrived, he saw a partially clothed woman, later identified as Sheila Rainford, sitting in the alley and bleeding profusely from apparent stab wounds. Officer Emerman called for an ambulance and remained with her until the ambulance arrived. The officer asked Ms. Rainford what had happened but was unable to understand her answer, mainly because her mouth was filled with blood. After Ms. Rainford left in the ambulance, Officer Emerman canvassed the area and recovered a knife approximately twenty to thirty feet from the spot where he had found her.

Ms. Rainford suffered a total of fifteen stab wounds in the face, chest, breasts, and abdomen. Her stomach was perforated in two places, and she had a collapsed lung. She also required plastic surgery to correct lacerated tendons in her left arm.

---

4. Tests performed when Ms. Rainford was admitted to the hospital shortly thereafter showed that her blood alcohol level was .195.

She was hospitalized for approximately five days and received additional follow-up care after her release.

Lakeisha McKinley, Ms. Rainford's sixteen-year-old daughter, visited her mother in the hospital and cared for her after she was released. At trial Ms. McKinley described her mother's injuries and scars, and recounted some of the lasting effects of those injuries, such as slurred speech. She also testified that she saw appellant "a couple of weeks later" at the Congress Heights Metro station, getting off a bus. Ms. McKinley looked at appellant and called his name, but he ran off when he saw her. She also testified that appellant left a number of personal items at Ms. Rainford's home, including his car, some important paperwork, and clothing. Shortly after her mother was released from the hospital, Ms. McKinley called a tow truck to move appellant's car to a nearby parking lot. Appellant's brothers eventually retrieved his car, but appellant never returned to pick up his clothing or mail.

### B. The Defense Evidence

Officer Anthony Lozado testified that he recovered a "Club" security device, used to prevent automobile theft, from the basement of Mr. Gaston's home on December 12, the day after Ms. Rainford was stabbed. The officer said he dusted the Club for fingerprints and noticed that it appeared to have blood on it that had not yet dried.

### C. The Government's Rebuttal

The government recalled Mr. Gaston, who testified that he had a Club that he kept on a chair in his living room. He said that when he last saw the Club, there was no blood on it. Mr. Gaston also testified that during the altercation on December 11, appellant struck him with "something real hard," but he did not know what it was.

### D. The Verdict

After a four-day trial, the jury found appellant guilty of AWIKWA and AAWA for the assault on Ms. Rainford, and simple assault for the assault on Mr. Gaston.

## II

Appellant contends that the trial court erred when it refused to allow him to argue that he was prejudiced by an alleged violation of his right to a speedy trial and denied his two pro se motions to dismiss. In response, the government maintains that the court was not required to allow appellant pro se to argue either motion because he was represented by counsel and that, in any event, his speedy trial claim was without merit. We agree with the government on both points and find no error.

### A. Background

On February 3, 2004, a warrant was issued for appellant's arrest on a charge of assault with intent to kill while armed. He was arrested in Virginia on April 10 and was then transferred to the District of Columbia. On April 16 he was ordered held without bond pending indictment and trial pursuant to D.C.Code § 23–1325(a) (2001), which does not specify a time period within which a person must be brought to trial. At a preliminary hearing on April 26, a Superior Court judge granted the government's request to continue to hold appellant under D.C.Code § 23–1325(a).

At a status conference on June 14, the government requested that appellant's case be transferred to the Accelerated Felony Trial Calendar. The case was then certified to that calendar before the Honorable Susan Winfield, who granted the government's request for additional time to complete its investigation and scheduled a status hearing for July 30. When the parties returned on July 30, the prosecutor

informed the court that the government would be concluding its investigation within thirty days, and the court scheduled an arraignment for September 8.

On September 8, 2004, appellant was arraigned on an indictment charging assault with intent to kill while armed (against Ms. Rainford), malicious disfigurement while armed (against Ms. Rainford),[5] two counts of aggravated assault while armed (against both Ms. Rainford and Mr. Gaston), and assault with a dangerous weapon (against Mr. Gaston). The court then informed defense counsel that appellant had filed a *pro se* motion to dismiss the indictment with prejudice, on the ground that the delay in the proceedings had exceeded the 100 days prescribed in D.C.Code § 23–1322. Defense counsel said he was unaware of the motion. The court explained that appellant was being held pursuant to D.C.Code § 23–1325(a), to which the 100–day time limit did not apply, and denied the *pro se* motion to dismiss.

The court reminded appellant of an earlier proceeding in which he had said he was satisfied with his attorney. Appellant acknowledged the conversation and said he had filed his motion to dismiss "maybe prematurely" because no indictment had been returned at the time he filed it. The court then urged appellant to work with his attorney rather than communicating directly with the court: "The reason for having a lawyer is so that your lawyer can represent your interest.... Please ... let

this lawyer do his job." Noting that appellant was facing serious charges and substantial prison time,[6] the court urged him to let his lawyer assist him:

> So this isn't misdemeanor stuff. This is very serious felony stuff, and he's a very experienced felony lawyer. So I encourage you to let him represent you or tell me you don't want him. Either way, okay?

Appellant replied simply, "Yes."

On October 18 the parties appeared again before the court and announced that they were ready for trial. The judge asked defense counsel why appellant had filed another *pro se* motion. She repeated her admonition that appellant needed to work through his attorney or elect to proceed without counsel, but that he could not do both. Appellant said that he had been studying at the prison law library and that he was "trying to get things filed." He also admitted that he had not asked his attorney to file the second motion. The judge denied appellant's motion, which she characterized as a "letter that sort of is a motion to dismiss the indictment [based on] alleged defects."

The judge then turned her attention to the first *pro se* motion to dismiss that appellant had filed, since there was some uncertainty as to whether it had actually been ruled on.[7] Defense counsel declined to argue in support of the motion. Appellant, however, said he was attempting to appeal the court's previous denial of that

---

5. The malicious disfigurement count was later dismissed on the government's motion shortly before trial.

6. The court explained:
 Every "while armed" count is a mandatory sentence. You're facing a lot of time. It's very serious. Don't mess this up by saying the wrong thing in a *pro se* motion. Call your lawyer and tell him [to] come visit you.... [P]lease let him do his job. And if there's a reason why on a technicality you

should be released, you will be released. But he'll know the technicality. You just won't be able to figure this out.

7. The judge recalled correctly that "we took care of that before," but there was no entry to that effect in the court file. The transcript of September 8, which is part of the record on appeal, makes clear that the court in fact denied the motion, but at this point that transcript had not yet been prepared.

motion to the "District Court." The judge told appellant that he could not appeal from her earlier ruling at that time, and reiterated her earlier ruling denying appellant's *pro se* motion to dismiss the indictment.

Because Judge Winfield was already engaged in another trial, appellant's case was then reassigned to the Honorable Maurice Ross. His trial before Judge Ross began later that day.

### B. *Applicable Legal Principles*

■ Under the Constitution, the defendant in a criminal case has a right to the effective assistance of counsel, *Gideon v. Wainwright,* 372 U.S. 335, 342, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), as well as the right to self-representation, *Faretta v. California,* 422 U.S. 806, 819, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). "However, these two rights are disjunctive. A criminal defendant does not have an absolute right to both self-representation *and* the assistance of counsel." *Griffin v. United States,* 447 A.2d 776, 778 (D.C.1982) (citation omitted; emphasis in original). Any decision to allow such "hybrid" representation is left to the sound discretion of the trial court. *Id.* at 779 (citing cases).

■ When a defendant claims that his Sixth Amendment right to a speedy trial has been violated, any delay of which he complains "is measured from the time [he] is formally accused," which is usually the date of his arrest or the date of his indictment, whichever comes first. *See Graves v. United States,* 490 A.2d 1086, 1091 (D.C. 1984) (en banc), *cert. denied,* 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986), *overruled in part on other grounds in Sell v. United States,* 525 A.2d 1017, 1021 (D.C. 1987). To prevail on a constitutional claim of denial of a speedy trial, a defendant must show "more than mere delay" between arrest and trial. *Tribble v. United States,* 447 A.2d 766, 768 (D.C.1982). In

evaluating such a claim, the trial court—and ultimately this court—must consider each of the four factors listed by the Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972): the length of the delay, the reasons for the delay, the defendant's assertion of the right to a speedy trial, and any resulting prejudice to the defendant. *See Parker v. United States,* 745 A.2d 933, 936 (D.C.2000) (citing *Barker* and *Graves*). "No one factor is either sufficient or essential; instead a 'difficult and sensitive balancing process' is required." *Turner v. United States,* 622 A.2d 667, 673 n. 8 (D.C. 1993) (quoting *Barker*). Finally, in reviewing a trial court's ruling on a defendant's speedy trial claim, we are bound by that court's findings of fact "unless they are plainly wrong or without evidence to support them. . . . We may reverse, however, for errors of law." *Graves,* 490 A.2d at 1091 (citations omitted).

With these principles in mind, we turn to the specific case before us.

### C. *Discussion*

■ At the outset, we readily hold that the trial court in this case did not abuse its discretion in refusing to allow appellant to argue his *pro se* motions. In the first place, appellant never requested hybrid representation, nor did he indicate that he was dissatisfied with his attorney. Instead, he told the court that he was satisfied with his attorney and said he understood that he needed to work with that attorney.

There is also nothing in the record to suggest that appellant intended to raise any argument regarding prejudice that he had not already included in his *pro se* motions or conveyed to his counsel. Indeed, his own attorney advised him that his understanding of the law concerning pretrial detention was inaccurate. Fur-

ther, at his arraignment on September 8, appellant made no reference to his *pro se* motion or to any assertion of prejudice resulting from the government's alleged violation of his right to a speedy trial. Rather, he told the court that he wanted "to plead not guilty once again." A few weeks later, at the hearing on October 18, the trial judge considered and denied appellant's second *pro se* motion, which alleged defects in his indictment, rather than a speedy trial violation.

 Finally, even if appellant had requested and the court had granted hybrid representation, the court would necessarily conclude that appellant's speedy trial claim was without merit because he had failed to demonstrate a Sixth Amendment violation under the standards set forth in *Barker v. Wingo.* Nor has he succeeded in making such a showing on appeal, even with the aid of able court-appointed counsel.

Appellant was arrested on April 10, and his trial began on October 18; hence the delay between his arrest and his trial was just a little over six months. This delay resulted in large part from two requests by the government for additional time to complete its investigation. At the time of the government's first request on June 14, appellant had been in jail for a little more than two months. When the government requested a second extension of time on July 30, appellant had been in jail for approximately three and a half months. At the hearing on that date, defense counsel said he was "satisfied with the government's representations" that it needed additional time to complete its investigation. Although appellant asserted a speedy trial violation in early August 2004 in his first *pro se* motion to dismiss the indictment, he based it on the incorrect statute. Appellant was being held pursuant to D.C.Code § 23–1325(a), which does not contain the 100–day trial deadline in D.C.Code § 23–1322, the statute upon which appellant re-

lied in his motion. *See McPherson v. United States,* 692 A.2d 1342, 1344–45 (D.C.1997) (noting that D.C.Code § 23–1325(a) contains no time limitation). Finally, appellant advances the same vague claims of prejudice on appeal as he did in his second *pro se* motion—that the delay "hampered" his defense and gave the government a "tactical advantage." This argument cannot prevail, however, because appellant fails to explain exactly how his defense was "hampered"—for example, he does not allege that any witness was unable to recall crucial facts or that he was unable to locate any witnesses—or what "tactical advantage" the government might have gained.

For all of these reasons, we find no error in the trial court's denial of appellant's *pro se* motions to dismiss the indictment for lack of a speedy trial.

### III

Appellant also argues that the trial court abused its discretion by admitting evidence of his post-crime conduct to demonstrate consciousness of guilt. Specifically, he asserts that evidence of his failure to return for his car, mail, and other documents after the assault on Ms. Rainford was more prejudicial than probative, and that judicial estoppel barred the government from using certain testimony for one purpose at the preliminary hearing and for a different purpose at trial.

Ms. Rainford testified that appellant left personal papers, including a document relating to an unemployment claim and a power of attorney, at her home before the assault on December 11, but never returned to retrieve those items after the assault. Over defense counsel's objection, the trial court ruled that appellant's failure to retrieve the items after the assault had "some relevance" to consciousness of guilt.

Ms. Rainford's daughter, Lakeisha McKinley, later testified that she saw ap-

pellant at the Congress Heights Metro station as he was getting off a bus. When Ms. McKinley called appellant's name, he looked at her and then ran away. She also stated that appellant left several personal items at her mother's home, including his car, "some paperwork," and some clothing. She said that appellant did not return to pick up his clothing or mail, but that his brothers retrieved the car some time after her mother was released from the hospital.

 Relevant evidence must be excluded only if its prejudicial effect substantially outweighs its probative value. *Johnson v. United States*, 683 A.2d 1087, 1100 (D.C.1996) (en banc) (adopting FED.R.EVID. 403). Evidence is relevant if it "makes the existence of a contested fact that is of consequence to the determination of the action more or less probable than it would be without that evidence." *Jones v. United States*, 625 A.2d 281, 284 (D.C.1993). We review a trial court's decision to admit or exclude evidence for abuse of discretion. *Id.; see Smith v. United States*, 777 A.2d 801, 806–807 (D.C.2001) (applying abuse of discretion standard to admission of evidence indicating consciousness of guilt).

 We are satisfied that the trial court did not abuse its discretion when it allowed Ms. Rainford and Ms. McKinley to testify that appellant left important papers, mail, some clothing, and his car at Ms. Rainford's house after the assault. The court also properly allowed Ms. McKinley to testify that appellant ran from her when she saw him at a Metro station and called his name. All of this conduct was probative of consciousness of guilt, and we see no way in which its probative value might have been outweighed by any potential prejudice. Appellant left two important documents at

Rainford's home that would have been difficult to replace—a power of attorney and papers related to an unemployment claim. The jury could reasonably infer that appellant, who lived in Virginia with his mother at the time, would not have left his car or important legal documents behind unless he feared returning to Ms. Rainford's home because he had attacked her. Likewise, it would have been reasonable to infer that appellant fled after seeing Ms. Rainford's daughter, either because he did not want to face Ms. Rainford's relatives or because he feared that they would report him to the police.

Finally, appellant contends that judicial estoppel precluded the government from using Lakeisha McKinley's testimony about seeing appellant at the Metro station to show consciousness of guilt. We find this argument unpersuasive. He states in his brief that at a preliminary hearing the government took the position that his appearance at the Metro station was "an intimidation or threat" to Ms. McKinley. The record tells us otherwise. At the preliminary hearing, defense counsel stated, while arguing for his client's pretrial release, that "[t]he government did present evidence that two of the children of the complainant saw Mr. Ferguson near their school, but there's no evidence that he tampered with them in any way or confronted them or even evidence that he saw them." Counsel then asked the court "to consider releasing" appellant but ordering him to "stay[ ] away from the complaining witness during the time that this case is pending." The government did not assert that appellant's presence at the Metro station constituted "an intimidation or threat" to Ms. McKinley, arguing instead that the court should order pretrial detention based on "the offense itself" and appellant's prior criminal record.[8] The court granted the

8. The prosecutor "refer[red] the court to the Pretrial Service Agency report" which includ-

ed information about "six prior convictions," mostly outside the District of Columbia, in-

request for release, with certain conditions, and scheduled a status hearing on a date several weeks later. We see nothing in this record to suggest that the government took a position at trial that was inconsistent with its position at the preliminary hearing, and thus we find no judicial estoppel.

### IV

The judgment of conviction is *Affirmed.*

cluding one or more that were "assaultive in nature."