*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 11-CF-1723

EMERO S. TORNERO, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF3-6534-09)

(Hon. Ann O'Regan Keary, Trial Judge)
(Hon. Robert I. Richter, Motions Judge)

(Argued January 9, 2014                    Decided July 3, 2014)

*Daniel Gonen*, Public Defender Service, with whom *James Klein* and *Samia Fam*, Public Defender Service, were on the brief, for appellant.

*Allen O'Rourke*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman, John P. Mannarino, Maia Miller*, and *Suzanne C. Nyland*, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and BLACKBURNE-RIGSBY, *Associate Judges*, and KING, *Senior Judge*.

BLACKBURNE-RIGSBY, *Associate Judge*:  Following a jury trial, appellant

Emero Tornero was convicted of various offenses stemming from a series of

attacks against Maryland and Virginia cab drivers who were driving in the District of Columbia.[1]  On appeal, appellant claims the trial court abused its discretion by: (1) refusing to instruct the jury to restart deliberations and correct its earlier

[1]  Appellant was originally charged by indictment with:  (1) the January 27, 2008, assault with intent to kill while armed ("AWIKWA") (car) on a senior citizen, in violation of D.C. Code §§ 22-401, -4502, -3601 (2001), aggravated assault while armed against a senior citizen (with aggravating circumstances) ("AAWA") (car), D.C. Code §§ 22-404.1, -4502, -3601, -3751, -3752 (2001), and felony destruction of property ("DP") (tires), D.C. Code § 22-303 (2001), on Shah Pour Dowlatshahi (Counts 1-3); (2) the February 9, 2008, aggravated assault with a deadly weapon ("ADW") (knife) with aggravating circumstances, D.C. Code §§ 22-402, -3751, -3752 (2001), carrying a dangerous weapon ("CDW") (knife), D.C. Code § 22-4504 (a) (2001), and misdemeanor DP (tires), D.C. Code § 22-303 on Medhanie Weldegerish (Counts 4-6); (3) the April 20, 2008, AWIKWA (car), assault with significant bodily injury ("ASBI") (car), D.C. Code § 22-404 (a)(2) (2001), and felony DP (car) on Mr. Weldegerish (Counts 7-9); (4) the June 1, 2008, ADW (car) with aggravating circumstances, CDW (knife), and felony DP (tires) on Jules Jean (Counts 10-12); (5) the July 27, 2008, felony DP (car window) on Shamarke Ladane (Count 13); (6) the August 16, 2008, ADW (car) with aggravating circumstances and felony DP (car) of Mr. Ladane, (Counts 14-15); and (7) the September 13, 2008, attempted fleeing of a law enforcement officer, D.C. Code § 50-2201.05b (b)(2) (2001) (Count 17).  A separate charge for solicitation of prostitution was severed before trial.

The jury acquitted appellant of AWIKWA on a senior citizen, Mr. Dowlatshahi, but convicted him of the lesser-included ADW (car) on a senior citizen.  Further, the Honorable Ann O'Regan Keary, who presided over the trial, declared a mistrial on the AWIKWA, ASBI, and felony DP charges, related to the April 20, 2008 attack, (Counts 7-9) after the jury failed to reach a verdict on these counts.  Judge O'Regan Keary also ordered a partial judgment of acquittal that reduced Count 3, felony DP, to misdemeanor DP.  The jury convicted appellant of the remaining charges as to all of the victims.  In total, appellant was sentenced to 290 months imprisonment:  114 months for AAWA, fifty-four months for each ADW, 180 days for misdemeanor DP, and fourteen months for the remaining counts.

statement describing appellant's trial counsel's closing argument as "improper," once it reopened closing argument; (2) denying appellant's severance motion on the grounds of mutual admissibility to prove identity; and (3) admitting a BB gun discovered during appellant's arrest into evidence to prove a felony destruction of property ("DP") charge (Count 13). Appellant also claims that the trial court plainly erred when it sentenced appellant to fourteen months for misdemeanor DP (Count 3), and that his convictions for ADW and AAWA merge. We determine that appellant's first two claims lack merit, but agree that the trial court committed reversible error in admitting the BB gun on one of appellant's destruction of property charges (Count 13). We also conclude that the trial court erred in its sentencing on the misdemeanor DP (Count 3) offense, and that his convictions for AAWA and ADW (Counts 1 and 2) merge. We therefore remand to the trial court to resentence appellant for his misdemeanor DP conviction (Count 3), and to vacate his felony DP conviction (Count 13) and the lesser-included ADW conviction (Count 1). In all other respects, we affirm.

## I.    Factual Background

### A. *The Charged Incidents*

Appellant carried out a number of attacks in 2008 against Maryland and Virginia-licensed cab drivers who were operating in the District of Columbia.  On January 27, 2008, around 3:15 a.m., appellant pulled up in a black or gray cab with D.C. plates next to Mr. Dowlatshahi, a Maryland-licensed cab driver, while he was stopped on Connecticut Avenue, Northwest ("N.W."), Washington, D.C.  From Mr. Dowlatshahi's passenger side, appellant said to Mr. Dowlatshahi:  "So are you picking up my fare," while Jose Moran sat in the passenger seat.[2]  After appearing to "do something" to Mr. Dowlatshahi's tires, appellant announced:  "[Y]ou have a flat tire."  While Mr. Dowlatshahi pulled over to inspect the damage, appellant "punched holes in both of [the driver's side] tires" and started to drive off, but then reversed "with great speed . . . to run [Mr. Dowlatshahi] over."  Mr. Dowlatshashi threw himself to the right to avoid being hit by appellant's cab.

---

[2]  Mr. Moran did not testify at trial.

On February 9, 2008, around 2:45 a.m., Mr. Weldegerish, a Maryland-licensed cab driver, dropped off two passengers on the 1500 block of Connecticut Avenue, N.W. Appellant, who was on foot, cut and deflated the two rear tires of Mr. Weldegerish's cab that bore Maryland plates. While investigating what happened, Mr. Weldegerish asked appellant "what happened here," prompting appellant to "brandish[] his knife toward" Mr. Weldegerish's stomach or abdomen. Appellant then drove off in a white D.C. cab "at high speed." On April 20, 2008, at around 3:00 a.m., appellant struck the rear of Mr. Weldegerish's cab at the intersection of New Hampshire Avenue and Q Street, N.W., with a D.C. cab. When Mr. Weldegerish stepped out of the cab, appellant struck him with the cab on his thighs from behind, with what Mr. Weldegerish felt was "the intention [] to kill [him], to lay [him] flat." Appellant then drove off "very fast[,]" to the point where the license plate fell as appellant drove away.[3]

On June 1, 2008, at approximately 3:00 a.m., appellant, driving a D.C. cab, pulled up to the cab of Mr. Jean, a Maryland-licensed cab driver, and intentionally deflated both of his passenger tires. Appellant asked Mr. Jean: "[W]hat are you doing in D.C.?" and also inquired whether Mr. Jean was "trying to pick up

---

[3] The jury was unable to reach a verdict on these charges. See *supra* note 1.

passengers in D.C." While inspecting his tires, Mr. Jean told appellant that "it look[ed] like [appellant] punctured [his] tire," at which point appellant made a U-turn, and slashed the tires on Mr. Jean's driver's side with a knife. Appellant drove off when Mr. Jean threatened to call the police, but soon after returned and drove "very rapidly" at Mr. Jean, who jumped onto a parked car to avoid being struck. Two bystanders, Heather Jones and Nheyreth Rivero, testified at trial that they witnessed the incident. Appellant and the government dispute whether Mr. Rivero was shown a photo array by a Metropolitan Police Department ("MPD") detective and made a subsequent identification. Mr. Rivero first testified that he was given such an opportunity, but later retracted his statement.

On July 27, 2008, at 11:30 p.m., while stopped at the intersection of 11th and M Street, N.W., Mr. Ladane, a Virginia-licensed cab driver, heard his rear windshield shatter. Mr. Ladane noted at trial, however, that when he heard his windshield shatter, he noticed a cab behind him; although he did not see what shattered his windshield, Mr. Ladane observed appellant's arm hanging out of the window of a silver or gray D.C. taxi, which he drove quickly in reverse after the

incident.[4]   No physical evidence was recovered explaining what broke Mr. Ladane's windshield.  Mr. Ladane then followed appellant into an alley to get his tag number, but eventually drove away when he saw appellant open his trunk.

On August 16, 2008, around 3:00 or 4:00 a.m., appellant again drove up to Mr. Ladane's cab at the intersection of K and 17th Street, N.W., "very fast[,]" and struck the driver's door of Mr. Ladane's cab three times with a blue Presidential D.C. cab.  Then, on March 16, 2009, Mr. Ladane saw appellant at the intersection of 14th and K Street, N.W., driving a green "Swift" D.C. cab.  Mr. Ladane informed an MPD officer about the incident, and appellant fled "very fast" from the officer, with "tires screeching," which caused the officer to "jump aside" to avoid being struck.  That same night, Mr. Ladane observed appellant at an Alexandria, Virginia pancake house, next to a Days Inn motel, and informed Alexandria police.  The police raided one of the rooms, where they first arrested appellant's brother and then appellant, who was discovered hiding in the bathroom,

---

[4]  Mr. Ladane admitted that there were pedestrians on the street, but that only one cab was behind him.

and recovered multiple sets of D.C. license plates and car keys, taxi meters, a modified screwdriver, and mail in appellant's name.[5]

The victim's descriptions of appellant at trial varied from vague to specific: Mr. Dowlatshahi — "black," with "curly hair," and a "[r]ound face," about twenty-five or twenty-six years old, and possibly clean-shaven, but he had only seen him for a split second; Mr. Weldegerish — "dark complected male, approximately thirty-five years [old], clean-shaven, [with] short brown hair[,]" although he was not looking at the assailant because he was "shocked," but later recognizing appellant as the assailant from the February 9, 2008 incident; Mr. Jean — black, with a dark complexion that was not as dark as Mr. Jean's, based on seeing appellant's face "very clearly[,]" but later describing appellant as "fair[,]" having "skin [that] is lighter than [Mr. Jean's]" while looking at appellant at trial; Mr. Ladane — gap in his teeth and looked "Ethiopian" based on ability to observe appellant's face "very clear[ly]" once in the alley during the first incident, and recognizing appellant as the same D.C. cab driver behind him when his rear

---

[5] The parties stipulated that with regard to the February 9, April 20, and July 27, 2008 incidents, appellant drove cabs that were registered to someone other than appellant, who in each instance did not give appellant permission to drive the cab. Regarding the March 16, 2009 event, the parties stipulated that the license plate on the cab appellant drove was reported lost, and appellant did not have permission to drive the cab nor did it belong to him.

windshield was shattered.[6] Appellant's trial counsel highlighted that appellant had a goatee since before the attacks and a scar on the left side of his face, neither of which was described by any of the victims.[7]

In a separate incident, on September 13, 2008, an MPD officer stopped and arrested appellant, who was driving a yellow D.C. Dial cab, with a punched ignition, on the corner of 14th and Randolph Street, N.W. MPD officers recovered a BB gun with $CO_2$ cartridges from the cab pursuant to appellant's arrest.

---

[6] Some of the victims later identified appellant as the perpetrator from the respective incidents during photo arrays, although the level of certainty, again, varied: Mr. Dowlatshahi — "maybe 60, maybe . . . 70 percent" sure; Mr. Weldegerish — picked out another person that "looked like" appellant during the first photo array, even though appellant was not in the array but later selected appellant's photo, claiming he was "100 percent sure" during the second photo array; Mr. Ladane — identified appellant "without hesitation and immediately" after the first incident and again during a second photo array, after the subsequent incident, claiming he felt "110 percent sure" about his identification. At a show-up on March 16, 2009, however, Mr. Ladane identified appellant's brother, Novato Tornero, as his attacker. The second photo array, which did not include Novato Tornero, followed the show-up. Both Mr. Ladane and Mr. Jean provided in-court identifications of appellant.

[7] A photo entered into evidence showed appellant had a gap in his teeth. Additionally, the parties stipulated that appellant did not have a license to operate a cab in the District of Columbia and had no title or registration for a cab in the District.

## B. Trial Court's Denial of the Motion for Severance

Prior to trial, appellant made a motion to sever the charges relating to the separate incidents against the out-of-state cab drivers on the basis that they had been improperly joined, given that the evidence of the various offenses would not be mutually admissible at separate trials under *Drew v. United States*, 118 U.S. App. D.C. 11, 331 F.2d 85 (1964),[8] and that such joinder would result in prejudice to the defense. The Honorable Robert I. Richter, who presided over the original motion, denied the motion, agreeing with the government that there was a "unique quality to the set of facts" underlying each of the crimes, which would make these admissible under *Drew*'s "signature crime exception as a means of proving identity." He also noted that "the similarities are pretty stark [among the

---

[8] Even though evidence of one crime is typically inadmissible to prove disposition to commit crime, "other crimes" evidence is admissible:

> [W]hen relevant to (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other, and (5) *the identity of the person* charged with the commission of the crime on trial.

118 U.S. App. D.C. at 16, 331 F.2d at 90 (emphasis added).

incidents], and could lead someone to believe that there's one person doing all this."

At the close of the evidence, the defense renewed its motion to sever, arguing that "all of the incidents are different such that it doesn't give rise to a unique signature crime or a common scheme or plan[,]" specifically pointing to the assault on Mr. Ladane as "a complete outlier" because it did not "involve any slashing of tires" or "involve any dispute over fares." The government rebuffed the defense's argument claiming that the incidents were probative of identity because each shared the common quality of attacking an out-of-state cab driver and the common method of attack of "an initial act of vandalism" followed by immediate fast flight. Judge O'Regan Keary denied the renewed severance motion, finding the incidents probative of identity. Judge O'Regan Keary declined, however, to instruct the jurors that they could "quantify and aggregate all the evidence[,]" instead instructing the jurors that they "should consider each offense and the evidence which applies to it separately."

### C. Trial Court's Admission of the BB Gun

Before trial, the government sought to admit the BB gun recovered from the cab appellant was driving on September 13, 2008, as *Johnson* evidence,[9] claiming that because Mr. Ladane saw appellant with his arm hanging out of the window, it was likely that appellant used the recovered BB gun to shatter Mr. Ladane's windshield on July 27, 2008. The trial court originally found there was "nothing in the condition of the car or whatever pieces of glass are found later that g[ave the court] anything other than speculation as to the shattering[,]" and that admitting the BB gun could be prejudicial because there was a risk that the jurors might connect the BB gun to the incident, "filling in the absence of evidence as to the commission of the destruction of property on July 27, [20]08[,] by just being aware that he possesses a BB gun." The trial court postponed ruling on admitting the BB gun in order to hear from the government's witnesses because doing so "may enable us to have a little bit better parameter set out of the evidence on which to base the decision."

---

[9] "[E]vidence offered to prove guilt of the charged offense [can] be offered in support of a prosecution of another crime" without being subject to *Drew* analysis when the evidence: "(1) is direct and substantial proof of the charged crime, (2) is closely intertwined with the evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context." *Johnson v. United States*, 683 A.2d 1087, 1098 (D.C. 1996).

The trial court subsequently admitted the BB gun, having heard from Mr. Ladane, among others:

> [U]nder the totality of circumstances here, [the BB gun] is relevant and not of [a] pure speculative nature. . . . [I]t's, in my view, not dispositive that Mr. Ladane didn't actually see the BB gun in [appellant's] hand either when he saw [appellant's] arm extended out the window of the vehicle right behind him, nor . . . when he confronted him later in the alley. . . . This falls into the category of evidence of possessing an instrumentality that could be used to commit a particular criminal charge. [I]t seems wholly illogical . . . that the government should be deprived from introducing the fact that two months later — which is not in the [c]ourt's view an extremely long period of time — [appellant] has readily available to him[,] in the car in which he's arrested on September 13, 2008[,] an instrumentality which could have been used to cause the shattering of the window.[10]

### D. Defense Counsel's Closing Argument

Prior to closing argument, the government objected to some of appellant's trial counsel's demonstrative exhibits because they suggested improper missing

---

[10] The trial court supported its conclusion with "the myriad case law that we have from our Court of Appeals permitting into evidence the fact of a witness having previously observed a defendant with a gun . . . virtually on point to this type of analysis."

evidence argument.[11]   The trial court agreed and found that such an argument amounted to an "improper missing evidence instruction" to the jury, which appellant's trial counsel could not make without prior clearance from the trial court.  Appellant's trial counsel claimed its argument was "a comment on the lack of evidence[,]" not a suggestion of "what the answers would be[,] had the government posed the questions[,]" which would be improper.

During its closing argument, appellant's trial counsel stated:  "[I]f there's evidence that you reasonably expected that you would be presented with[,] and you don't have it, you look to the government," to which the government objected.  The trial court overruled the objection.  Appellant's trial counsel continued:  "So in Mr. Dowlatshahi's case, you heard there was a witness by the name of Jose Moran.  If you have any questions about him —" at which point the trial court sustained the objection, warned counsel not to repeat the argument, and stated in open court:  "I sustain that objection.  That's an improper argument."

That same night, after jury deliberations began, appellant's trial counsel filed a motion for a mistrial, or in the alternative, to reopen closing argument, claiming

---

[11]   Specifically, the government objected to any indication that it had not asked any questions to Novato Tornero, appellant's brother.

that the trial court improperly restricted its argument that the government's lack of evidence created a reasonable doubt, citing *Greer v. United States*, 697 A.2d 1207 (D.C. 1997), and explaining how the trial court erroneously applied the "missing witness" doctrine.  Even though the trial court found the motion "bordering on the frivolous," noting that appellant's trial counsel had "made all of the arguments about the absence of evidence that [he was] entitled to[,]" it ultimately reopened closing argument to allow appellant to make his argument regarding the lack of evidence because it "stopped short of being a missing evidence or missing witness argument [given that] it does not invite [the jury] to draw a negative inference from the absence of evidence.  It just invites them to find that the [g]overnment has failed to meet its burden of proof."  The trial court, however, rejected appellant's requests to instruct the jury to begin deliberations anew, or explain that the trial court would permit the argument because it no longer found the argument improper.  The trial court ultimately instructed the jury as follows:

> I brought you back in[to] the courtroom because we have some very limited, very brief, additional closing argument[] to present to you from the counsel.  This is something the [c]ourt is permitting in the interest of completeness and because I may have cut off the defense counsel's argument a bit hastily at one point. . . .  The argument[] that you'll hear . . . is just a portion of the overall closing argument[].  *It should not be given any greater or lesser weight because of the timing at which you are receiving it.  You should consider this additional argument as just part of the overall closings and not highlight it more or less.*

Appellant's trial counsel proceeded to comment on the government's failure to meet its burden of proof due to the lack of corroborating evidence — namely, the testimony of eyewitness Jose Moran, the independent passengers who rode in Mr. Weldegerish's cab, and the officer who was almost hit by appellant's cab on September 13, 2008, as well as the alleged photo array presented to Mr. Rivero. The jury then deliberated for another hour and forty-four minutes before rendering its final verdict.

## II.    Discussion

### A. *Defense Counsel's Closing Argument*

We first address appellant's claim of error relating to closing argument. Appellant argues that the trial court erred when it refused to instruct the jury to begin its deliberations anew, and to correct its earlier statement to the jury that appellant's trial counsel's closing argument was improper once it reopened closing argument.[12]  According to appellant, because the trial court did not instruct the jury

---

[12] Appellant clarified at oral argument that although its brief emphasized both the trial court's error in originally cutting off appellant's closing argument

(continued…)

to restart deliberations and did not correct its earlier characterization of appellant's trial counsel's closing argument as "improper," its decision to reopen closing argument failed to cure the error, and prejudiced the defense.

"Because a trial court has broad discretion in controlling the scope of closing argument, we review a decision to restrict such argument [for] . . . abuse of discretion." *Haley v. United States*, 799 A.2d 1201, 1207 (D.C. 2002) (citations omitted). "[D]iscretion is abused, however, if the court prevents defense counsel from making a point essential to the defense." *Id.* (quoting *Peoples v. United States*, 329 A.2d 446, 449 (D.C. 1974) (alteration in original) (citation omitted)). Similarly, "[d]ecisions regarding reinstruction of a jury are committed to the discretion of the trial court; absent abuse of that discretion we will not reverse." *Blaine v. United States*, 18 A.3d 766, 774 (D.C. 2011) (footnote and citation omitted). In this case, in reviewing whether any error requires reversal, we apply the non-constitutional test for harmless error under *Kotteakos v. United States*, 328 U.S. 750, 765 (1946): whether this court can "say, with fair assurance, . . . that the

---

(…continued)
and its instructional errors, its position on appeal focused on the trial court's errors in not instructing the jury once it decided to reopen closing argument.

judgment was not substantially swayed by the error."[13] *See also Blaine*, *supra*, 18 A.3d at 775; *Haley*, *supra*, 799 A.2d at 1208 n.5.

Here, the trial court originally cut off trial counsel's argument because it found the portion that would have explored why the jury had not heard from witness Jose Moran to constitute improper "missing witness" or "missing evidence" argument, stating to the jury: "I sustain that objection. That's an improper argument."[14] Ultimately, however, the trial court reopened closing argument because it agreed with appellant's clarifying explanation that its closing argument was proper given that it consisted of "a comment on the lack of evidence" and the government's failure to provide sufficient corroboration in its

---

[13] Errors regarding instructions to the jury are sometimes reviewed under the *Chapman* standard, if of a constitutional nature. *Blaine*, *supra*, 18 A.3d at 775. We need not apply a constitutional harmless error analysis under *Chapman* because appellant's Sixth Amendment right to have "his theory of the case vigorously argued to the jury," *Umanzor v. United States*, 803 A.2d 983, 1000 (D.C. 2002), and his Fifth Amendment right to be convicted only on proof beyond a reasonable doubt, *Wheeler v. United States*, 930 A.2d 232, 240 (D.C. 2007), have not been violated. Appellant's trial counsel was able to make his argument to the jury when the trial court reopened closing argument. See *infra* pages 18–19.

[14] "A missing evidence argument occurs when counsel asks the jury to infer that certain evidence, which exists and would elucidate the transaction, was not presented because it was unfavorable to the opposing party's case." *Greer*, *supra*, 697 A.2d at 1211 (citations omitted).

case.[15] Appellant's trial counsel was thus afforded the opportunity to comment on the government's failure to prove its case beyond a reasonable doubt by not offering, among other pieces of evidence, the testimony of eyewitness Jose Moran, the independent passengers who rode in Mr. Weldegerish's cab, and the officer who appellant nearly hit with his cab on September 13, 2008, as well as the alleged photo array presented to Mr. Rivero. Accordingly, appellant's trial counsel was not prohibited from making any arguments that were "essential to the defense." *Peoples, supra*, 329 A.2d at 449 (citation omitted).

Even assuming the trial court erred by subsequently failing to instruct the jury to restart deliberations and not correcting its earlier characterization of the original closing argument as "improper," we are unconvinced by appellant's assessment that the trial court's decision to reopen closing argument failed to cure

---

[15] Appellant's reliance on *Greer* is unavailing. In *Greer*, we concluded that the trial court erred when it instructed the jury to base its decision on the evidence presented, "and not on evidence that has not been presented." 697 A.2d at 1210–11. We determined that, unlike an improper missing evidence argument, in this case, defense counsel should have been allowed to properly "comment in closing argument on the failure of the government to present corroborative physical evidence" because the argument went to whether the government met its burden of proving guilt beyond a reasonable doubt. *Id.* at 1210 (citations omitted). We emphasized that the jury may consider the lack of evidence that the government "might reasonably be expected to present" in assessing whether the government met its burden of proof. *Id.*

the errors. Appellant's contention that without the benefit of the instruction and correcting of the record, "the jury's verdict [became] . . . a foregone conclusion" by producing a coercive effect on the jury to stick to its verdict, after it had deliberated for nearly a full day, plainly overreaches. Here, the trial court avoided any prejudice to appellant by specifically instructing the jury that the argument was but "a portion of the overall closing argument. *It should not be given any greater or lesser weight because of the timing at which you are receiving it. You should consider this additional argument as just part of the overall closings and not highlight it more or less.*" Presumptively, the jury heeded the trial court's instruction and gave appellant's additional argument proper consideration when it continued deliberations. *See Swanson v. United States*, 602 A.2d 1102, 1107 (D.C. 1992) (finding no error in trial court's "decision not to instruct the jury on self-defense after each substantive offense . . . where the judge specifically identified the offenses to which self-defense is relevant" given that "the jury is 'presumed to follow instructions'" (citations omitted)). Moreover, the jury deliberated for another hour and forty-four minutes before issuing its final verdict, suggesting that it was not coerced into the decision. *Cf. Leake v. United States*, 77 A.3d 971, 979 (D.C. 2013) (agreeing with the trial court's determination that the "over thirty minute[]" period between the time the jury was sent back to deliberate and its final verdict "provided an 'adequate opportunity to have talked things through'" and to

address any concerns following a breakdown in the jury poll (citation omitted)). Thus, any errors were ultimately harmless. *See Blaine*, *supra*, 18 A.3d at 775; *Haley*, *supra*, 799 A.2d at 1208 n.5.

### B. *Appellant's Severance Motion*

Appellant next claims that the trial court erred by joining the charges relating to the six attacks on Mr. Dowlatshahi, Mr. Weldegerish, Mr. Jean, and Mr. Ladane because evidence of the separate incidents was not "mutually admissible" under *Drew* to prove identity, and that their joinder ultimately prejudiced appellant's defense. The government contends that the trial court's decision to join the charges as mutually admissible on the issue of identity is supported by the trial record. Moreover, because the jury was instructed to consider each charge separately in assessing the government's proof beyond a reasonable doubt, appellant suffered no "compelling prejudice." We agree with the government's assessment.

"A motion for severance on the ground of prejudicial joinder is committed to the sound discretion of the trial court." *Bright v. United States*, 698 A.2d 450, 454 (D.C. 1997) (citation omitted). "We will reverse the denial of a motion to sever

counts under D.C. Super. Ct. Crim. R. 14 only upon a clear showing of abuse of discretion." *Id.* (citations and internal quotation marks omitted). Appellant bears the burden of demonstrating "the most compelling prejudice" resulting from the trial court's denial of his motion to sever. *Parker v. United States*, 751 A.2d 943, 947 (D.C. 2000).

In cases where joinder is premised on the "similar character" of the charged offenses:

> [A] motion to sever should be granted unless (1) the evidence as to each offense is separate and distinct, and thus unlikely to be amalgamated in the jury's mind into a single inculpatory mass, *or* (2) **the evidence of each of the joined crimes would be admissible at the separate trial of the others**.

*Id.* (second emphasis added) (citation omitted). "Other crimes" evidence is mutually admissible "when relevant, *inter alia*, to identity or a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other." *Coleman v. United States*, 619 A.2d 40, 44 (D.C. 1993) (citation and internal quotation marks omitted); *see also Drew, supra*, 118 U.S. App. D.C. at 16, 331 F.2d at 90.

In assessing whether each of the charged incidents would be mutually admissible in separate trials for the purposes of identity, we look to whether the

"circumstances surrounding each crime demonstrate that there is a reasonable probability that the same person committed both 'due to *the concurrence of unusual and distinctive facts* relating to the manner in which the crimes were committed.'" *Brooks v. United States*, 448 A.2d 253, 257 (D.C. 1982) (emphasis added) (quoting *Drew*, *supra*, 118 U.S. App. D.C. at 16, 331 F.2d at 90). Here, Judge Richter first determined that there was a "unique quality to the set of facts" underlying each of the crimes, with fairly "stark" similarities among the charged incidents that "could lead someone to believe that there's one person doing all this[,]" thus making the incidents admissible under *Drew's* identity exception. Judge O'Regan Keary later affirmed that she, too, found the incidents sufficiently probative of identity to warrant joining the charges when she denied appellant's renewed motion for severance.

Judge Richter's assessment, as well as Judge O'Regan Keary's, to the extent that it built on Judge Richter's position, is supported by the evidence. In this case, many of the qualities of the incidents presented a "concurrence of unusual and distinctive facts relating to the manner in which the crimes were committed." *Brooks*, *supra*, 448 A.2d at 257 (citation omitted). Specifically, each attack shared the following "consistent features": (1) an out-of-state cab driver victim; (2) an assailant driving a D.C. cab; (3) a similar geographic zone, e.g., within a contained

area of N.W., Washington, D.C. ; (4) a similar time, i.e., late at night; (5) a similar method of attack originating with an act of vandalism, including slashing the cab driver's tires, shattering the driver's windshield, or ramming the victim's cab, followed by an assault on any cab driver who inspected the damage; and (6) a final high-speed and sometimes reckless flight. *See Ifelowo v. United States*, 778 A.2d 285, 293 (D.C. 2001). Moreover, in at least two incidents, appellant showed distinctive animosity toward the victims, accusing them of "picking up [his] fare" (Mr. Dowlatshahi incident) or "trying to pick up passengers in D.C." (Mr. Jean incident), and in three of the charged offenses, appellant slashed the tires of his victims (Mr. Dowlatshahi, Mr. Weldegerish (February 9, 2008), and Mr. Jean).

Arguably, this case does not present the strongest set of "unusual and distinctive facts" to be probative of identity, but nor does it fall at the other end of the spectrum, where the "combination of circumstances" is not "sufficiently distinctive" to be probative of identity. *See Easton v. United States*, 533 A.2d 904, 908 (D.C. 1987) (citations omitted). For example, in *Brooks*, we concluded that evidence of another rape would be admissible in appellant's rape case "as to the identity of the perpetrator[,]" and vice-versa, because the other rape involved numerous common characteristics with the charged rape, including "the nature of the comments made by the rapist to his victim, the length of the assault, . . . the use

of the victim's underwear to bind her hands[,]" as well as a close concurrence in time (nine days apart) and place (wooded park areas of N.W., Washington, D.C.). 448 A.2d at 257. In *Easton*, however, we determined that the trial court admitted evidence of an earlier robbery, which occurred two years prior to the charged robbery, in error because the combination of "sufficiently commonplace" circumstances and "marked" differences between the events did not "create a reasonable probability that the same person committed both offenses." 533 A.2d at 908–09. Specifically, we concluded that robberies of middle-aged cab drivers, taking place during evening hours, and under threat of a sharp object were not "especially unusual occurrences[,]" and, that the varying number of assailants, and "markedly different course of events" between the two incidents, were material. *See id.* at 909 (highlighting that in the prior incident, appellant threatened the driver, took the money, and quickly left the scene, while in the second, appellant and his accomplice "ransacked the cab" because they were upset by the small amount of money they recovered, and kidnapped, held, and continually threatened the driver at knifepoint — accounting for material distinctions). In this case, the charged attacks also presented a number of differences: (1) the victims' descriptions of appellant varied; (2) the victims failed to identify appellant's goatee and facial scar; (3) appellant drove a different cab in each incident; and (4) the attacks on Mr. Weldegerish and Mr. Ladane occurred in a unique manner — the

former involving a tire slashing followed by a second attack where appellant struck the rear of Mr. Weldegerish's cab and his body (thighs), and the latter, the shattering of Mr. Ladane's windshield and later repeated ramming of his cab. Appellant specifically claims that the differences, especially the "markedly different" nature of the attacks, were "material." We disagree.

In this regard, *Ifelowo* is instructive. In *Ifelowo*, we examined three robberies and found five consistent similarities ((1) a threat of force; (2) evening settings within an hour of each other; (3) "reasonable geographic proximity"; (4) similar tactics, e.g., "dr[iving] up, confront[ing] and robb[ing] an isolated or vulnerable person(s), and dr[iving] away"; and (5) a similarly described vehicle), and five differences ((1) varying victims' descriptions of the driver, including whether he exited the get-away car; (2) victims' descriptions of a lack or presence of assailants' accents; (3) the victims' inconsistent mention of "a cardboard license plate"; (4) the use of a knife in one incident, compared to the suggestion of a gun in the other two; and (5) use of knit caps in one robbery). 778 A.2d at 293–94. We held that even taking into account the differences, "the combination of consistent features of each of the three robberies, outweighed the variations, and that any striking differences were cured by the rebuttal testimony of the other robber . . . who implicated [appellant] in all three incidents." *Id.* at 295.

Similarly, here, the six similarities between the attacks go beyond the "sufficiently commonplace," and the four differences are not material enough to overcome the fact that there are "enough points of similarity in the *combination of circumstances* surrounding the . . . crimes to create a reasonable probability that the same person committed each." *Ifelowo*, *supra*, 778 A.2d at 290–91, 294–95 (emphasis added) (citation omitted). With regard to the nature of the distinctive attacks on Mr. Weldegerish and Mr. Ladane, we find the government's argument at oral argument persuasive, that appellant was completing "unfinished business" after being thrown off by the victims' actions, e.g., Mr. Weldegerish's confronting appellant and asking him "what happened here," while inspecting the damage to his cab, and Mr. Ladane's following appellant to take down his license plate. In both instances, appellant destroyed property belonging to the victim and later came back to complete the usual follow-up assault on the victim. And, in any event, "[i]t is not necessary for every detail of the crimes to be identical, nor that they share any single factual characteristic that is compellingly unique." *Ifelowo*, *supra*, 778 A.2d at 294 (citation omitted). Accordingly, the trial court did not abuse its discretion in denying the motion for severance.[16]

---

[16] Even if the charges were joined in error, which we do not conclude occurred on this record, appellant cannot show "compelling prejudice" because Judge O'Regan Keary instructed the jury to "consider each offense and the

(continued…)

## C. Admission of the BB Gun

"We review a trial court's decision to admit or exclude evidence for abuse of discretion." *Ferguson v. United States*, 977 A.2d 993, 1001 (D.C. 2009) (citations omitted). "Evidence is relevant if it makes the existence of a contested fact that is of consequence to the determination of the action more or less probable than it would be without that evidence." *Id.* (citation and internal quotation marks omitted). Additionally, the evidence must have some connection to both the defendant and the crime, and "should not be admitted if the connection is too remote or conjectural." *King v. United States*, 618 A.2d 727, 728–29 (D.C. 1993) (citation omitted); *see also Johnson*, *supra* note 9, 683 A.2d at 1098 (determining that evidence that is "(1) is direct and substantial proof of the charged crime, [or] (2) is closely intertwined with the evidence of the charged crime" can be admitted to prove appellant committed the charged offense).

---

(…continued)
evidence which applies to it separately[,]" thus protecting against any improper inference of propensity that the jury might draw. *Parker*, *supra*, 751 A.2d at 947. Further, the jury was unable to reach a verdict on the AWIKWA, ASBI, and felony DP charges, related to the April 20, 2008 attack (Counts 7–9), suggesting that it was able to "consider each offense" and the evidence relating to each, separate from the remaining offenses.

Appellant argues that the trial court abused its discretion in admitting the BB gun in the absence of more than a speculative link between appellant's BB gun and the incidents, because to be admissible, the evidence had to be linked to *both* the defendant and the crime. We agree.

In this case, the trial court admitted the BB gun into evidence because it found it:

> [R]elevant and not of [a] pure speculative nature. . . . [I]t seems wholly illogical . . . that the government should be deprived from introducing the fact that two months later[,] . . . [appellant] has readily available to him in the car in which he's arrested[,] . . . an instrumentality which could have been used to cause the shattering of the window.

Notably, the trial court postponed its ruling in order to hear from the majority of the government's witnesses because it originally determined that "nothing in the condition of the car or whatever pieces of glass are found later . . . g[ave the court] anything other than speculation as to the shattering." We find the trial court's prior concerns telling.

Here, no subsequent trial testimony established that the victim, Mr. Ladane, or any other witness, observed appellant with a BB gun in his hand during the July 27, 2008 attack, or that any BB gun pellets were recovered from Mr. Ladane's car

linking the BB gun to the destruction of property at issue. If anything, Mr. Ladane testified that he specifically did *not know* what shattered his windshield. Consequently, even with the benefit of Mr. Ladane's testimony, we disagree with the trial court's determination that simply because the BB gun is an instrumentality which *could have been used* to cause the shattering of the window, such an attenuated link alone is sufficient to make the BB gun relevant to the charged offense. *See King*, *supra*, 618 A.2d at 728–29.

This case is unlike other cases where we found no error in the admission of a weapon, usually a gun, and the sole question was whether the weapon identified was potentially the same one used to commit the crime, once a prior link had *already* established that a weapon was used during commission of the crime. *See King*, *supra*, 618 A.2d at 729 (providing that complainant's testimony of his knowledge of guns, and subsequent identification of the weapon produced in court as the same pistol appellant had used, established a sufficient link between appellant and the charged crime); *Ali v. United States*, 581 A.2d 368, 375 (D.C. 1990) (same). *But see Burleson v. United States*, 306 A.2d 659, 661–62 (D.C. 1973) (rejecting conjectural link showing that the admitted gun was recovered five hours after the assault, in a separate neighborhood from that of the assault, and in a vehicle owned and driven by appellant's brother, where complainant identified the

gun, but also stated that "all 38's look alike," and appellant disavowed using a gun). Thus, the BB gun is not relevant to, nor sufficiently linked to the charged incident, even if one method for shattering the windshield, among countless others, *might* be by means of the BB gun. That is too conjectural a link on which to base its admission.[17] *Burleson*, *supra*, 306 A.2d at 662. Consequently, the trial court abused its discretion in admitting the BB gun.

We acknowledge the very real danger that "there is a general mental tendency, when a corporal object is produced as proving something, to assume, on sight of the object, all else that is implied in the case about it. The sight of it seems to prove all the rest." *Burleson*, *supra*, 306 A.2d at 662. As we explained in *Burleson*, and the trial court even noted when it first postponed ruling on this evidence, admitting the BB gun ran the risk that the jurors might too easily link the presence and appellant's possession of the BB gun to the shattering of Mr. Ladane's windshield, even in the absence of any other evidence as to *how* this crime was committed. *See id.* Consequently, we conclude that admission of the

---

[17] We note that because the gun is insufficiently linked to the relevant destruction of property offense here, it also cannot be admitted as *Johnson* "direct and substantial" evidence of the charged crime. 683 A.2d at 1098.

BB gun was prejudicial to appellant and constituted reversible error with regard to Count 13.[18]

### D. Sentencing and Merger Claims

Appellant notes, and the government concedes, that the trial court erred when it imposed a fourteen month sentence on appellant for his misdemeanor DP conviction (Count 3), see *supra* note 1.  *See* D.C. Code § 22-303 (providing that the maximum penalty for misdemeanor DP is 180 days imprisonment).  Appellant also claims that his convictions for ADW and AAWA for the January 27, 2008 attack on Mr. Dowlatshahi merge.[19]  *See Nero v. United States*, 73 A.3d 153, 159 (D.C. 2013) (lesser-included ADW conviction merges into the greater included AAWA conviction).  We agree with both claims.

---

[18] We reject appellant's invitation to reverse all of appellant's convictions on the premise that the government's "one-man crime wave" theory required the jury to link all of the pieces of evidence together, thus suggesting that if one piece falls, the entire case is affected.  The jury was specifically instructed to consider the evidence in each offense separately.  See *supra* note 16.

[19] Even though appellant raises his merger claim for the first time in his reply brief, we are not precluded from addressing his claim.  *See Carter v. United States,* 957 A.2d 9, 22 n.19 (D.C. 2008) ("An illegal sentence . . . may be challenged at any time." (citation omitted)).

### III.   Conclusion

Accordingly, we remand to the trial court with instructions to resentence appellant for his misdemeanor DP conviction (Count 3) within statutory limits, and to vacate his felony DP conviction (Count 13) and the lesser-included ADW conviction (Count 1).  In all other respects, we affirm.

*So ordered.*